250 S.W.3d 248 (2007)
STATE of Arkansas, Appellant,
v.
L.P., III, a Minor, Appellee.
No. 06-990.
Supreme Court of Arkansas.
February 15, 2007.
*249 Mike Beebe, Att'y Gen., by LeaAnn J. Irvin, Ass't Att'y Gen., Little Rock, AR, for appellant.
C. Thompson "Tom" Owens, Office of the Public Defender, Pine Bluff, AR, for appellee.
DONALD L. CORBIN, Justice.
Appellant State of Arkansas appeals the order of the Jefferson County Circuit Court granting the motion to suppress custodial statements made by Appellee L.P., III, a minor. For reversal, the State argues that the trial court's interpretation of Ark.Code. Ann. § 9-27-317 (Repl.2002), that police were required to notify L.P.'s parents prior to interrogating him, was erroneous and, consequently, the trial court erred in suppressing L.P.'s statements. Additionally, the State argues that the trial court erred in suppressing a second statement made by L.P. on the basis that the right to counsel had attached and therefore police improperly questioned the minor outside the presence of his attorney. We affirm.
The record reflects that on April 19, 2006, school officials at Dollarway Junior High contacted authorities after L.P. threatened to shoot another student, E.M. Detectives Marcus Smith and Phillip Gober, with the Pine Bluff Police Department, responded to the school's call and took L.P. into custody. L.P. was then taken to the Pine Bluff Police Department and questioned about the alleged threat, as well as a criminal-mischief complaint. L.P. remained in police custody and was transported to the Jefferson County Juvenile Detention Center.
A probable-cause hearing was held in circuit court on April 24, 2006, regarding the allegation of terroristic threatening. At that hearing, a public defender was *250 appointed to represent L.P. The State filed a petition of delinquency against L.P., alleging that he had committed the act of terroristic threatening by threatening to shoot E.M. Four additional petitions alleging delinquency were filed against L.P. on May 2, 2006. Those four petitions alleged that L.P. had committed one count of criminal mischief, one count of breaking and entering, one count of residential burglary, and two counts of theft of property. These charges were filed after authorities conducted a second interview with L.P. on April 27, 2006.
On May 10, 2006, L.P. filed a motion to suppress his custodial statements. Therein, he argued that he was not properly advised of his Miranda rights, that he did not make a knowing, intelligent, or voluntary waiver of his rights, and that his rights under section 9-27-317 were violated because authorities failed to advise him of his rights in his own language and failed to notify a parent prior to taking his statement. L.P. further argued that he was incarcerated and had been appointed counsel when authorities questioned him a second time on April 27 and, therefore, police violated his rights by questioning him outside the presence of his attorney.
A hearing on the suppression motion was held on June 20, 2006. Detective Smith testified that he came into contact with L.P. on April 19, 2006, when he spoke with him on the campus of Dollarway Junior High regarding an allegation of terroristic threatening. Detective Smith, who along with Detective Gober transported L.P. to the police station, stated that he did not attempt to contact L.P.'s parents either while at the school or once he took the minor into custody. According to Detective Smith, he advised L.P. of his rights, including his right to have an attorney or a parent present before making any statement, and when asked if he understood those rights, L.P. signed the rights form and indicated that he understood his rights. Detective Smith further stated that at no time did L.P. request that an attorney or a parent be present during his questioning. On cross-examination, Detective Smith stated that he read the information straight from the rights form and provided no further explanation about those rights. He also admitted that he did not ask L.P. how to get in touch with his parents.
Detective Gober testified that he was present with Detective Smith when he picked up L.P. from Dollarway Junior High and later when Detective Smith advised L.P. of his rights. During Detective Smith's questioning of L.P., Detective Gober researched L.P.'s criminal history and discovered that he had been implicated on a criminal-mischief charge. Once Detective Smith completed the interview related to the terroristic-threatening charge, Detective Gober questioned him about the criminal-mischief charge. Detective Gober admitted that he did not attempt to contact L.P.'s parents. He then stated that he later learned that L.P. might have been involved with other criminal activities, so he picked him up from the Jefferson County Juvenile Detention Facility and took him to the police station for further questioning on April 27.
With regard to this second interview, Detective Gober testified that he advised L.P. of his Miranda rights and further stated that L.P. indicated that he understood those rights. Detective Gober stated that he never attempted to contact L.P.'s parents and that L.P. never requested that an attorney or a parent be present. On cross-examination, Detective Gober admitted that he completed a personal identification sheet for L.P. that contained his parents' names and a home phone number, but that he never attempted to contact a *251 parent. Detective Gober also admitted to being present at a probable-cause hearing on the terroristic-threatening charge on April 24, and that he knew counsel had been appointed to represent L.P. on that charge.
Trina Reed, L.P.'s mother, also testified. She stated that she was at home on April 19 and April 27, and that authorities never contacted her. She stated that the school contacted her sometime on April 19 and told her that L.P. had been picked up after threatening someone, but she did not remember what time that call was received. Reed further testified that at the time of his questioning, her son was twelve years old, was failing his classes, and had just started mental-health counseling for Attention Deficit Disorder.
In an order entered on June 29, 2006, the trial court determined that L.P.'s statements made on April 19 and April 27 should be suppressed. Initially, the trial court found that L.P. was properly advised of his Miranda rights, as evidenced by his initials and signature on the rights forms, and had presented no evidence that his waivers were anything other than knowing, intelligent, and voluntary. The trial court after reviewing section 9-27-317 determined, however, that authorities had an affirmative duty to notify a parent before questioning L.P. and failed to do so in this case and, thus, suppressed his statements. In addition, the trial court determined that once L.P. was arrested an adversarial judicial proceeding commenced and counsel was appointed to represent him. The trial court further explained that the nexus of events in this case were so close together that L.P.'s right to counsel had attached when the officer questioned L.P. on April 27 outside the presence of his court-appointed counsel, thereby, violating L.P.'s rights. From this order, comes the instant appeal.
As its first point on appeal, the State argues that it was error for the circuit court to suppress L.P.'s custodial statements on the basis that they were taken without any attempt having been made to contact a parent. More specifically, the State avers that the circuit court erred in its interpretation of section 9-27-317. According to the State, section 9-27-317(h)(2), requiring authorities to attempt to contact a parent prior to questioning, and (i)(2)(C), providing that a juvenile must invoke his right to speak to a parent, cannot be reconciled and based on express legislative intent subsection (i)(2) should be controlling. L.P. counters that the trial court's interpretation of the statute was correct.
We recently reiterated our standard of review regarding issues of statutory interpretation in Department of Human Services v. Howard, 367 Ark. 55, 238 S.W.3d 1 (2006), where we stated that we review issues of statutory interpretation de novo, as it is for this court to decide what a statute means. See also Baker Refrigeration Sys., Inc. v. Weiss, 360 Ark. 388, 201 S.W.3d 900 (2005). Thus, although we are not bound by the trial court's interpretation, in the absence of a showing that the trial court erred, its interpretation will be accepted as correct on appeal. Id.
We begin our analysis of this issue by reviewing the relevant portions of section 9-27-317, which provide:
(h)(1) All waivers of the right to counsel, except those made in the presence of the court pursuant to subsection (a) of this section, shall be in writing and signed by the juvenile.
(2)(A) When a custodial parent, guardian, or custodian cannot be located or is located and refuses to go to the place where the juvenile is being held, *252 counsel shall be appointed for the juvenile.
(B) Procedures shall then be the same as if the juvenile had invoked counsel.
(i)(1)(A) Whenever a law enforcement officer has reasonable cause to believe that any juvenile found at or near the scene of a felony is a witness to the offense, he or she may stop that juvenile.
(B) After having identified himself or herself, the officer must advise the juvenile of the purpose of the stopping and may then demand of the juvenile his or her name, address, and any information the juvenile may have regarding the offense.
(C) Such detention shall in all cases be reasonable and shall not exceed fifteen (15) minutes, unless the juvenile shall refuse to give this information, in which case the juvenile, if detained further, shall immediately be brought before any judicial officer or prosecuting attorney to be examined with reference to his or her name, address, or the information the juvenile may have regarding the offense.
(2)(A) A law enforcement officer who takes a juvenile into custody for a delinquent or criminal offense shall advise the juvenile of his or her Miranda rights in the juvenile's own language.
(B) A law enforcement officer shall not question a juvenile who has been taken into custody for a delinquent act or criminal offense until the law enforcement officer has advised the juvenile of his or her rights pursuant to subdivision (i)(2)(C) of this section in the juvenile's own language.
(C) A law enforcement officer shall not question a juvenile who has been taken into custody for a delinquent act or criminal offense if the juvenile has indicated in any manner that he or she:
(i) Does not wish to be questioned;
(ii) Wishes to speak with his or her custodial parent, guardian, or custodian or to have that person present; or
(iii) Wishes to consult counsel before submitting to any questioning.
(D) Any waiver of the right to counsel by a juvenile shall conform to subsection (h) of this section.
In ruling that authorities had an affirmative duty under section 9-27-317 to try to contact a parent in this case, the circuit court stated:
While the Legislature may not have drafted this language well, and while it may be very circuitous and perhaps they wished to restrict it to subsection (h)(1), they did not do so. Thus, the implication is clear that the police or other law enforcement personnel have an affirmative duty to try to contact a custodial parent to advise them that the juvenile has been arrested. If the parent then refuses to go to the police department or wherever the juvenile is being held, then it is the same as if the juvenile had invoked his right to counsel. If the police cannot locate a parent or guardian, then it is also as if the juvenile had invoked their right to counsel.
We do not believe the trial court erred in its interpretation of the statute.
The basic rule of statutory construction is to give effect to the intent of the legislature. Ainsworth v. State, 367 Ark. 353, 240 S.W.3d 105 (2006); Arkansas Dep't of Econ. Dev. v. William J. Clinton Presidential Found., 364 Ark. 40, 216 S.W.3d 119 (2005). Where the language of a statute is plain and unambiguous, we determine legislative intent from the ordinary meaning of the language used. Id. In considering the meaning of a statute, we *253 construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. Id. We construe the statute so that no word is left void, superfluous, or insignificant, and we give meaning and effect to every word in the statute, if possible. Id. However, when a statute is ambiguous, we must interpret it according to the legislative intent, and our review becomes an examination of the whole act. Id. We reconcile provisions to make them consistent, harmonious, and sensible in an effort to give effect to every part. Id. We also look to the legislative history, the language, and the subject matter involved. Id. Additionally, statutes relating to the same subject are said to be in pari materia and should be read in a harmonious manner, if possible. Id. Remaining mindful of these tools of statutory interpretation, we turn to the case at hand.
The legislative history of the pertinent subsections of section 9-27-317 is a helpful starting point in determining whether the trial court erred in its interpretation of the statute. Prior to 1994, section 9-27-317 required, in pertinent part, that a parent or guardian be consulted regarding a juvenile's decision to waive the right to counsel and that such a waiver be signed by both the juvenile and the parent or guardian. This requirement was amended, however, by enactment of Act 67 of 1994. Pursuant to Act 67, the requirement that a parent or guardian must sign the juvenile's waiver-of-rights form was eliminated. Act 67 also added a new subsection, section 9-27-317(g)(2), that allowed a juvenile to waive his right to counsel and required that the juvenile must invoke his right to speak to a parent or to counsel. Act 67 contained an emergency clause that revealed the legislative intent underlying the changes to section 9-27-317. It stated:
It is hereby found and determined by the Seventy-Ninth General Assembly of the State of Arkansas meeting in the Second Extraordinary Session of 1994 that the present law requiring the written agreement of a parent, guardian, or custodian before a juvenile taken into custody on an allegation of delinquency may waive counsel and make a statement severely hampers the ability of law enforcement officers to question detained juveniles. It is further found that confusion exists as to the authority of law enforcement officers to question juvenile witnesses without the prior approval of a parent, guardian, or custodian. Therefore, in order to immediately allow juveniles taken into custody to waive counsel and make a statement under the same standard as adult arrestees, and to clarify the authority of law enforcement officers to take statements of juvenile witnesses, an emergency is hereby declared to exist[.]
Section 9-27-317 was again amended by Act 1610 of 2001.[1] Pursuant to this amendment, the General Assembly added subsection (h)(2) that requires an officer to attempt to locate a parent or guardian when a juvenile is taken into custody and (i)(2)(A) that requires a juvenile be advised of his rights in his own language. While, there is no emergency clause in Act 1610 to explain legislative intent, the title does offer some insight and states in part:
AN ACT TO REQUIRE LAW ENFORCEMENT OFFICERS TO ATTEMPT TO NOTIFY THE PARENTS OR GUARDIANS OF JUVENILES TAKEN INTO CUSTODY IMMEDIATELY AFTER THE JUVENILE IS TAKEN INTO CUSTODY
*254 This court has held that even though the title of an act is not part of the law, it may be referred to in order to help ascertain the intent of the General Assembly. Williams v. Little Rock Sch. Dist., 347 Ark. 637, 66 S.W.3d 590 (2002); Routh Wrecker Serv., Inc. v. Wins, 312 Ark. 123, 847 S.W.2d 707 (1993).
According to the State, the 1994 amendment focused on the fact that the right to waive is solely that of the juvenile and parental consent is not required; thus, it follows that questioning a juvenile who has waived the right to counsel is allowed prior to any attempt to contact a parent. The State further asserts that the language of subsection (h)(2) regarding notification of a parent "should have spoken only to the limited goal of attempting to contact a parent after a juvenile is taken into custody." Otherwise, according to the State, the notification requirement would turn the statutorily conferred right of waiver of counsel into a burden that would prevent the juvenile from waiving his or her own right. This would lead to an absurd result, according to the State. We disagree.
The fallacy underlying the State's argument is revealed by examining the legislative history of section 9-27-317 in the context of this court's cases interpreting that section, as one of the rules of statutory construction involves a presumption that the legislature is fully aware of prior legislation and case law under preexisting law. Bunch v. State, 344 Ark. 730, 43 S.W.3d 132 (2002). As previously stated, Act 67 removed the requirement that a parent sign the juvenile's waiver-of-rights form. In the emergency clause of the act, the legislature stated that the purpose of the act was to remove any confusion regarding the authority of law enforcement officers to question juvenile witnesses without the prior approval of a parent. Then, after a series of cases interpreting section 9-27-317 and the requirement of parental notification, the General Assembly passed Act 1610 of 2001 that added the requirement that a parent be notified once a juvenile is taken into custody.
Most notably, the General Assembly passed Act 1610 a little over a month after this court handed down its opinion in Ray v. State, 344 Ark. 136, 40 S.W.3d 243 (2001). There, this court interpreted section 9-27-317 and held that a juvenile, charged as an adult, had no right to have a parent present during an interrogation, even when the juvenile requested a parent. In reaching this conclusion, this court recognized that the legislature had provided juveniles with a statutory right to speak to a parent or to have one present during questioning but further pointed out that under section 9-27-317, police officers had no duty to inform a juvenile of this right. Id. This holding was consistent with our previous holding in Miller v. State, 338 Ark. 445, 451, 994 S.W.2d 476, 479 (1999), where we stated:
In sum, the legislature has given a juvenile the statutory right to speak to a parent or guardian or to have one present upon the condition that the juvenile makes such a request. The legislature has not, however, imposed upon the police the duty to inform the juvenile of that right, and we cannot do so where the statute is silent. . . . Although we may question the prudence of giving a juvenile a right without imposing a corresponding duty on the police to inform the juvenile of that right, that is a policy decision properly left to the legislature, and not this court.
We must presume that when amending section 9-27-317 in 2001 the legislature was fully aware of this court's interpretation of that section as requiring no parental involvement when a juvenile is taken into custody unless the juvenile specifically *255 invokes his or her right to speak to or have a parent present during questioning. At the very least, law enforcement officers now have a duty to attempt to notify a parent or guardian when a juvenile is taken into custody and if a parent or guardian cannot be located or will not cooperate, counsel must be appointed for the juvenile.
There is simply no merit to the State's argument that the trial court's interpretation that a parent must be notified under subsection 9-27-317(h)(2)(A) is contrary to subsection 9-27-317(i)(2)(C) that requires the juvenile to invoke his right to speak to a parent or an attorney. In advancing its argument, the State assumes that the added requirement of parental notification negates subsection (i), while in reality the two subsections can be read harmoniously. Under subsection (h)(2)(A), authorities must notify a parent when his or her child has been taken into custody. The parent can then go to the place where the juvenile is being held and under subsection (i)(2)(C), if the juvenile requests to speak to a parent that parent will be present. If, on the other hand, the parent chooses not to go to the place where the juvenile is being detained, counsel is appointed to represent the juvenile. Again, if the juvenile invokes his right to speak to an attorney, then one has already been appointed to represent him. As previously stated, under our rules of statutory construction, we reconcile statutory provisions to make them consistent, harmonious, and sensible in an effort to give effect to every part of a statute. Ainsworth, 367 Ark. 353, 240 S.W.3d 105. Accordingly, we agree with the trial court's ruling that authorities were required to attempt to contact a parent prior to questioning L.P. Because the record is clear that no such attempt was made, we cannot say that the trial court erred in suppressing L.P.'s custodial statements.
As a second point on appeal, the State argues that the trial court also erred in ruling that the officers violated L.P.'s Sixth Amendment right to counsel by questioning him on April 27 outside the presence of counsel. According to the State, this was error because the Sixth Amendment right to counsel is offense specific and does not attach until a prosecution is commenced. Further, the State argues that an invocation of the Sixth Amendment right to counsel is not an invocation of the Fifth Amendment right to counsel, nor does it invoke the right to counsel in a subsequent, unrelated offense. It is not necessary to address this argument, as the trial court properly suppressed L.P.'s statements on the basis that officers made no attempt to contact a parent prior to questioning him.
Affirmed.
NOTES
[1] Act 1192 of 1999 also amended section 9-27-317, but that amendment only involved a redesignation of subsection (g) to subsection (h).