ARKANSAS DEPARTMENT of HUMAN SERVICES and Child Welfare Agency Review Board, *Appellants/Cross-Appellees v.* Matthew Lee HOWARD; Craig Stoopes; Anne Shelley; and William Wagner, *Appellees/Cross-Appellants*

05-814                                          238 S.W.3d 1

Supreme Court of Arkansas
Opinion delivered June 29, 2006

*Arkansas Dep't of Human Services,* by: *Kathy L. Hall,* for appellants/cross-appellees.

*Mitchell, Blackstock, Barnes, Wagoner, Ivers & Sneddon,* by: *David Ivers;* and *American Civil Liberties Union Foundation,* by: *Leslie Cooper* and *James D. Esseks;* and *ACLU of Arkansas,* by: *Griffin J. Stockley,* for appellees/cross-appellants.

*Family Council*, by: *Martha Adcock*, and *Alliance Defense Fund*, by: *Benjamin W. Bull, Glen Lavy, Chris Stovall, Randall Wenger*, and *Dale Schowengerdt*, for amici curiae, Family Research Council and Family Council.

*Logan Scott Stafford*, and *Wilmer, Cutler, Pickering, Hale, and Dorr, LLP*, by: *Stuart F. Delery*, for amici curiae, The Child Welfare League of America, The Evan B. Donaldson Adoption Institute, and Arkansas Advocates for Children & Families.

*Brad Hendricks Law Firm*, by: *George R. Wise, Jr.*, and *Jenner & Block LLP*, by: *Paul M. Smith* and *William M. Hohengarten*, for amici curiae, American Psychological Association, Arkansas Psychological Association, National Association of Social Workers, and National Association of Social Workers.

*Steele Hayes*; *Rutgers School of Law – Newark*, by: *Suzanne B. Goldberg*; and *Wright Lindsey & Jennings, LLP*, by: *Isaac A. Scott, Jr.*, and *Troy A. Price*, for amici curiae, Arkansas Affiliate Office of the National Conference for Community and Justice, Bishop Larry E. Maze, Professor John M.A. DiPippa, and Professor Adjoa A. Aiyetoro.

*Lambda Legal Defense and Education Fund*, by: *Susan L. Sommer* and *Kenneth D. Upton, Jr.*; and *Sullivan Law Firm, P.A.*, by: *Gary L. Sullivan*, for amici curiae, Lambda Legal Defense and Education Fund, Inc.; Children of Lesbians and Gays Everywhere; Family Pride; Human Rights Campaign; Human Rights Campaign Foundation; National Gay & Lesbian Task Force; Parents, Families & Friends of Lesbians & Gays; and Stonewall Democratic Club of Arkansas.

DONALD L. CORBIN, Justice. Appellants/Cross-Appellees Department of Human Services and Child Welfare Agency Review Board appeal the judgment and order of the Pulaski County Circuit Court ruling that Section 200.3.2 of the Minimum Licensing Standards for Child Welfare Agencies ("Regulation 200.3.2") violated the separation-of-powers doctrine and, thus, was unconstitutional. Appellees/Cross-Appellants Matthew Lee Howard, Craig Stoopes, Anne Shelley, and William Wagner (collectively known as "Appellees") cross-appeal asserting that the circuit court erred in holding that the regulation does not violate (1) the right to

equal protection and (2) the right to privacy or intimate association. As this case involves issues of statutory construction, first impression, and substantial public interest, jurisdiction is proper pursuant to Ark. Sup. Ct. R. 1-2(a)(1), (b)(1), and (b)(4). We find no error on direct appeal and affirm.

On April 6, 1999, Appellees filed their original complaint in the Pulaski County Circuit Court seeking a declaratory judgment and injunctive relief challenging the validity of Regulation 200.3.2 enacted by the Child Welfare Agency Review Board that same year. Regulation 200.3.2 provides that:

> No person may serve as a foster parent if any adult member of that person's household is a homosexual. Homosexual, for purposes of this rule, shall mean any person who voluntarily and knowingly engages in or submits to any sexual contact involving the genitals of one person and the mouth or anus of another person of the same gender, and who has engaged in such activity after the foster home is approved or at a point in time that is reasonably close in time to the filing of the application to be a foster parent.

Appellees asserted that the regulation was outside of the scope of the Board's authority and that it was unconstitutional on its face because it violated both the Equal Protection Clause of the United States and Arkansas Constitutions, and the federal and state constitutional rights to privacy and intimate association. Following numerous pretrial hearings, this case came to trial on March 23–25, 2004, October 5–6, 2004, and December 20, 2004.

On December 29, 2004, the circuit court issued its judgment, a memorandum opinion, and its findings of fact and conclusions of law. Based upon its findings of fact, the circuit court concluded that: (1) Regulation 200.3.2 does not promote the health, safety, or welfare of children and, thus, is unconstitutional as being in violation of the separation-of-powers doctrine; (2) Regulation 200.3.2 does not violate the equal-protection provisions of the United States and the Arkansas Constitutions; and (3) Regulation 200.3.2 does not violate the plaintiffs' constitutional right to privacy or intimate association under either the United States or Arkansas Constitutions. This appeal followed.

### A. Jurisdiction

Although DHS does not raise the issue of jurisdiction until its reply brief, it must be addressed prior to addressing the merits of

the arguments on both direct and cross-appeal. *See Brewer v. Carter,* 365 Ark. 531, 231 S.W.3d 707 (2006).[1] DHS's argument is two-fold. First, it contends that none of Appellees had standing to bring the suit because they had not applied to be foster parents when the suit was filed in 1999. Second, it argues that the Appellees did not exhaust all administrative remedies and, therefore, the court lacks jurisdiction to hear the matter. Upon review, this argument is without merit and we have jurisdiction to review the case.

## 1. Standing

In order to establish standing, a party must show that he has a right which a statute infringes upon and that he is within the class of persons affected by the statute. *Thompson v. Arkansas Social Servs.,* 282 Ark. 369, 669 S.W.2d 878 (1984). *See also Jegley v. Picado,* 349 Ark. 600, 80 S.W.3d 332 (2002). This rule applies to regulations, such as the regulation in question here. *Id.* Moreover, an appellant can have standing to challenge a regulation, even if the appellant had never actually applied for a permit, because to apply for a permit would be futile. *See International Bd. of Teamsters v. United States,* 431 U.S. 324 (1977); *United States v. Hardman,* 297 F.3d 1116 (10th Cir. 2002); *Desert Outdoor Advertising, Inc. v. City of Moreno Valley,* 103 F.3d 814 (9th Cir. 1996).

■ Here, DHS claims that Appellees lack standing because they failed to apply to become foster parents when the suit was filed. This argument is without merit. First, Appellees did attempt to become foster parents and were turned away because of the regulation's exclusion. Second, even if Appellees had not applied to become foster parents, they still had standing to bring suit because they are within the class of persons affected by the regulation,[2] and each Appellee's attempt to become a foster parent would be futile because of the regulation. As such, Appellees had standing to bring suit challenging the regulation.

---

[1] Subject-matter jurisdiction can be raised at any time. *See Arkansas Dep't of Human Servs. v. Isbell,* 360 Ark. 256, 200 S.W.3d 873 (2005).

[2] Any person seeking to become a foster parent who has an adult member of his or her household that is a practicing homosexual is within the class of persons affected by the regulation.

## 2. Exhaustion of Remedies

The doctrine of exhaustion of administrative remedies provides that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted. *Cummings v. Big Mac Mobile Homes, Inc.*, 335 Ark. 216, 980 S.W.2d 550 (1998); *Barr v. Arkansas Blue Cross & Blue Shield*, 297 Ark. 262, 761 S.W.2d 174 (1988). However, exhaustion of administrative remedies is not required where no genuine opportunity for adequate relief exists, where irreparable injury will result if the complaining party is compelled to pursue administrative remedies, or where an administrative appeal would be futile. *Id.* Consequently, inadequate or futile administrative remedies do not need to be exhausted prior to pursuing other remedies. *Id.*

Moreover, we have held that a plaintiff can maintain an action for declaratory judgment even if the plaintiff has not requested the agency to rule upon the validity of the rule or regulation in question. *McEuen Burial Ass'n v. Arkansas Burial Ass'n Bd.*, 298 Ark. 572, 769 S.W.2d 415 (1989). *See also* Ark. Code Ann. § 25-15-207(d) (Repl. 2002). In *McEuen*, we explained that section 25-15-207(a) of the Administrative Procedure Act, clearly establishes that:

> [I]t is not necessary that the injury already have occurred or that a person show he was affected by it in order to obtain a declaratory judgment. Either the "threatened application" of a rule or the threat of injury will justify a party in seeking to have such regulations reviewed.

*Id.* at 575, 769 S.W.2d at 417. Thus, we held that, "Although there had been no denial of a certificate to any burial association, it is obvious that some of the associations, as a result of the application of the rules, are threatened with denial." *Id.*

Here, DHS argues that Appellees did not exhaust all administrative remedies before proceeding with the present cause of action, and, therefore, we are without jurisdiction to hear the matter. Specifically, DHS claims that no request was made to the Board to repeal the regulation, no administrative hearing was requested, and there was no final agency decision from which to appeal to the circuit court. This argument is without merit because, in this case, (1) it would be futile for Appellees to pursue administrative remedies, and (2) section 25-15-207 provides that an action may be brought in circuit court when a regulation injures or threatens to injure the plaintiff.

■ Appellees, and all other similarly situated individuals, are completely barred from becoming foster parents because of this regulation. Much like in *McEuen*, it is obvious that the application of the regulation injures all prospective foster parents who are (1) homosexual or (2) have an adult homosexual living in the prospective foster home. Thus, Appellees were not required to exhaust all administrative remedies prior to pursuing their cause of action against DHS and the Board. *See* Ark. Code Ann. § 25-15-207; *Cummings*, 335 Ark. 216, 980 S.W.2d 550; *Ford v. Arkansas Game & Fish Comm'n*, 335 Ark. 245, 979 S.W.2d 897 (1998); *McEuen*, 298 Ark. 572, 769 S.W.2d 415; *Barr*, 297 Ark. 262, 761 S.W.2d 174. As such, we have jurisdiction to hear the present appeal.

### B. Separation of Powers

For its only argument on appeal, DHS argues that the circuit court erred in holding that the regulation passed by the Board violated the separation-of-powers doctrine. Specifically, DHS asserts that the circuit court erred in finding that Regulation 200.3.2 did not promote either the health, safety, or welfare of children and, therefore, violated the separation-of-powers doctrine.

Here, Ark. Code Ann. § 9-28-405(c)(1) (Repl. 2002) delegates to the Board the authority to "promulgate rules and regulations that: (1) promote the health, safety, and welfare of children[.]" The Board passed Regulation 200.3.2 pursuant to this authority; however, the circuit court found that the Board exceeded its authority when it implemented a blanket exclusion of homosexuals and individuals who resided with a homosexual from becoming foster parents. Specifically, the circuit court found that the regulation did not promote the health, safety, and welfare of foster children and, thus, the Board exceeded its authority in legislating for public morality. Upon review, the circuit court did not err in reaching this conclusion and finding that Regulation 200.3.2 was unconstitutional as being in violation of the separation-of-powers doctrine.

In *Rose v. Arkansas State Plant Board*, 363 Ark. 281, 288-89, 213 S.W.3d 607, 615 (2005), this court reiterated the standard of review for issues of statutory construction, stating:

> [W]e review issues of statutory interpretation *de novo*, as it is for this court to decide what a statute means. *Baker Refrigeration Sys., Inc. v.*

*Weiss*, 360 Ark. 388, 201 S.W.3d 900 (2005); *Monday v. Canal Ins. Co.*, 348 Ark. 435, 73 S.W.3d 594 (2002). Thus, although we are not bound by the trial court's interpretation, in the absence of a showing that the trial court erred, its interpretation will be accepted as correct on appeal. *Id.*

The basic rule of statutory construction is to give effect to the intent of the legislature. *Ward v. Doss*, 361 Ark. 153, 205 S.W.3d 767 (2005); *Arkansas Tobacco Control Bd. v. Santa Fe Natural Tobacco Co., Inc.*, 360 Ark. 32, 199 S.W.3d 656 (2004). Where the language of a statute is plain and unambiguous, we determine legislative intent from the ordinary meaning of the language used. *Id.* In considering the meaning of a statute, we construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. *Id.* We construe the statute so that no word is left void, superfluous or insignificant, and we give meaning and effect to every word in the statute, if possible. *Id.*

Pursuant to section 9-28-405(c)(1), the Board only had the authority to enact rules and regulations that promote the health, safety, and welfare of children. Thus, we must now look at whether Regulation 200.3.2 falls within the bounds of this authority. In reviewing the validity of a rule or regulation, this court must give the regulation the same presumption of validity as it would a statute. *McLane Co., Inc. v. Davis*, 353 Ark. 539, 110 S.W.3d 251 (2003); *Department of Human Servs. v. Berry*, 297 Ark. 607, 764 S.W.2d 437 (1989). In reviewing the adoption of regulations by an agency under its informal rule-making procedures, a court is limited to considering whether the administrative action was arbitrary, capricious, an abuse of discretion or *otherwise not in accordance with the law. Id.* Specifically, it is well settled that "an agency has no right to promulgate a rule or regulation contrary to a statute[.]" *McLane*, 353 Ark. at 546, 110 S.W.3d at 256. *See also McLane Co., Inc. v. Weiss*, 332 Ark. 284, 965 S.W.2d 109 (1998); *Pledger v. C.B. Form Co.*, 316 Ark. 22, 871 S.W.2d 333 (1994).

In the present case, Regulation 200.3.2 does not promote the health, safety, or welfare of foster children but rather acts to exclude a set of individuals from becoming foster parents based upon morality and bias. With regard to the health, safety, or welfare issue, the circuit court made the following pertinent findings of fact:

4. When the Child Welfare Agency regulations were first promulgated in 1997 there was no provision excluding lesbians, gay men,

or persons living with such individuals because the Child Welfare Agency saw no need for such exclusion (*Stipulated Facts*, #6).

. . . .

6. The Board's attorney advised the Board that there was no need to enact the exclusionary provision because the preexisting regulations already gave the Board the enforcement power to take care of any concerns and to adequately protect the interests of children (*Stipulated Facts*, #14).

. . . .

9. Prior to 1999, there was no prohibition under any Arkansas law or regulation excluding lesbians or gay men or those living with them from being foster parents (*Stipulated Facts*, #26).

10. The defendants are aware of "homosexuals," as defined, who have served as foster parents in Arkansas (*Stipulated Facts*, #27).

11. The defendants are not aware of any child whose health, safety, and/or welfare has been endangered by the fact that such child's foster parent, or other household member, was "homosexual", as defined (*Stipulated Facts*, #28).

12. The State has no statistics indicating that gays are more prone to violence than heterosexuals or that gay households are more unhealthy than heterosexual households (*Stipulated Facts*, #30).

13. Based on its foster care statistics the defendants do not know of any reason that lesbians and gay men would be unsuitable to be foster parents (*Stipulated Facts*, #31).

. . . .

23. The blanket exclusion may be harmful to promoting children's healthy adjustment because it excludes a pool of effective foster parents.

. . . .

29. Being raised by gay parents does not increase the risk of problems in adjustment for children.

30. Being raised by gay parents does not increase the risk of psychological problems for children.

31. Being raised by gay parents does not increase the risk of behavioral problems.

32. Being raised by gay parents does not prevent children from forming healthy relationships with their peers or others.

33. Being raised by gay parents does not cause academic problems.

34. Being raised by gay parents does not cause gender identity problems.

. . . .

37. Children of lesbian or gay parents are equivalently adjusted to children of heterosexual parents.

38. There is no factual basis for making the statement that heterosexual parents might be better able to guide their children through adolescence than gay parents.

39. There is no factual basis for making the statement that the sexual orientation of a parent or foster parent can predict children's adjustment.

40. There is no factual basis for making the statement that being raised by lesbian or gay parents has a negative effect on children's adjustment.

41. There is no reason in which the health, safety, or welfare of a foster child might be negatively impacted by being placed with a heterosexual foster parent who has an adult gay family member residing in that home.

. . . .

46. There is no evidence that gay people, as a group, are more likely to engage in domestic violence than heterosexuals.

47. There is no evidence that gay people, as a group, are more likely to sexually abuse children than heterosexuals.

These facts demonstrate that there is no correlation between the health, welfare, and safety of foster children *and* the blanket exclusion of any individual who is a homosexual or who resides in a household with a homosexual. While DHS argues that the regulation protects the healthy, safety, and welfare of foster children because "we do not know the effect of temporary homosexual parenting," this argument flies in the face of the evidence presented by Appellees' experts and the circuit court's findings of fact. Moreover, DHS admits that, prior to the adoption of the regulation, homosexuals were allowed to be foster parents and no known complaints were ever made in those situations. As such, the circuit court did not err in finding that there was no rational relationship between the regulation's blanket exclusion and the health, safety, and welfare of the foster children.

Second, Regulation 200.3.2 is an attempt to exclude homosexuals and persons who reside with a homosexual from becoming foster parents based upon the Board's standard of morality and its biases. Various members of the Board, including Robin Woodruff who introduced the regulation, testified as to their guidance and reasoning behind adopting Regulation 200.3.2. Woodruff testified that, in her opinion, (1) same-sex relationships are wrong, (2) homosexual behavior is a sin, (3) homosexuality violates her biblical convictions, (4) adults who have same-sex orientation should remain celibate, and (5) she would not be a proponent of her children spending time with openly gay couples. James Balcom, another member of the Board, testified that there were three components to his decision to vote to enact the regulation — scientific evidence, his personal beliefs including his religious beliefs, and societal mores. Balcom further testified that he believed gay relationships are immoral and that he has a moral objection to people being in a household where there is a same-sex relationship going on. This testimony demonstrates that the driving force behind adoption of the regulation was not to promote the health, safety, and welfare of foster children, but rather based upon the Board's views of morality and its bias against homosexuals.

Additionally, DHS admits that "the regulation may protect the morals of our foster children" but claims that it also protects the health, safety, and welfare of the foster children. As shown above, there is no correlation between the blanket exclusion and the health, safety, and welfare of foster children. Thus, the only other underlying purpose behind the enactment of the regulation is morality. The General Assembly did not include,

under section 9-28-405(c)(1), the promotion of morality in its delegation of power to the Board. Consequently, the Board was acting outside its areas of responsibilities when it enacted Regulation 200.3.2, and was in violation of the separation-of-powers doctrine.

■ In *Federal Express Corp. v. Skelton*, 265 Ark. 187,197-98, 578 S.W.2d 1, 7 (1979), we explained the separation-of-powers doctrine and stated:

> Our government is composed of three separate independent branches: legislative, executive and judicial. Each branch has certain specified powers delegated to it. The legislative branch of the State government has the power and responsibility to proclaim the law through statutory enactments. The judicial branch has the power and responsibility to interpret the legislative enactments. The executive branch has the power and responsibility to enforce the laws as enacted and interpreted by the other two branches. The "Separation of Powers Doctrine" is a basic principle upon which our government is founded, and should not be violated or abridged.

In the instant case, the Board's enactment of Regulation 200.3.2 was an attempt to legislate for the General Assembly with respect to public morality. Because the Board acted outside the scope of its authority and infringed upon a legislative function, we cannot say that the circuit court erred in finding that Regulation 200.3.2 was unconstitutional as being in violation of the separation-of-powers doctrine.

■ As we have held that Regulation 200.3.2 is unconstitutional on the basis of separation of powers, we will not address the other constitutional arguments raised by Appellees on cross-appeal because to do so would amount to an advisory opinion. *See Dodson v. Allstate Ins. Co.*, 365 Ark. 458, 462, 231 S.W.3d 711, 715 (2006) (holding "that courts do not sit for the purpose of determining speculative and abstract questions of law or laying down rules for future conduct").

Affirmed on direct appeal; cross-appeal moot.

FRANKLIN A. POFF, JR., Sp.J., joins in this opinion.

BROWN, J., concurs.

GLAZE, J., not participating.

ROBERT L. BROWN, Justice, concurring. The Howard plaintiffs raised three constitutional arguments for striking

down Regulation 200.3(2): violation of equal protection of the laws, violation of privacy rights, and violation of separation of powers. The trial court made abundant findings of fact supporting the lack of any legitimate government reason for Regulation 200.3(2), but chose only to strike it down because of the separation-of-powers violation. Indeed, the trial court specifically found that the regulation did not violate the equal-protection rights of the Howard plaintiffs or their privacy rights. Though I agree that the ruling on the separation-of-powers count is right, the trial court erred in my judgment by not finding equal-protection and privacy violations as well. I write, accordingly, to address those two issues.

The undeniable focus of this case for purposes of the equal-protection and privacy issues must be the best interest of the foster children. Thus, the issue must be framed in terms of whether gay and lesbian foster parents will adversely affect and hamper foster children during their period of separation from their natural parents. Reunification with the natural parents, of course, is always the ultimate goal for the foster-care program.

Prior to January 1999 when Regulation 200.3(2) was adopted by the Child Welfare Agency Review Board, gay and lesbian couples were permitted to serve as foster parents. No problems with this arrangement were reported, according to the Stipulated Facts of the parties. Single persons, whether homosexual or heterosexual, still are permitted to serve as foster parents. And there is no act or regulation prohibiting gay or lesbian couples from adopting children in Arkansas.

Screening of prospective foster parents has always been a major facet of the program to protect against abusive situations. Minimum Licensing Standards adopted by the Department of Human Services were and are in place to assure, according to the Stipulated Facts, "that only those individuals capable of providing stable, nurturing, safe, healthy homes would be approved to be foster parents." These screening standards applied to both heterosexual and homosexual couples prior to the adoption of Regulation 200.3(2). The stated intent of the standards was to screen out those who posed a violent, sexual, or disease risk to foster children. Those standards and enforcement mechanisms are still available to eliminate any undesirable behavior by homosexual and heterosexual foster parents alike.

Despite this history, in January 1999, the Child Welfare Agency Review Board reversed course in its treatment of gay and lesbian foster parents and adopted Regulation 200.3(2), which reads:

> 2. No person may serve as a foster parent if any adult member of that person's household is a homosexual. Homosexual, for purposes of this rule, shall mean any person who voluntarily and knowingly engages in or submits to any sexual contact involving the genitals of one person and the mouth or anus of another person of the same gender, and who has engaged in such activity after the foster home is approved or at a point in time that is reasonably close in time to the filing of the application to be a foster parent.

There can be no serious disagreement that Regulation 200.3(2) is directed to sexual conduct that occurs in the privacy of the bedroom. It is unspecified under the terms of Regulation 200.3(2) whether the proscribed sexual conduct is limited to the home where the foster child resides. Apparently, and the State more or less conceded this at oral argument, if the conduct occurs away from the home, it still acts to disqualify a couple as foster parents.

Regulation 200.3(2) overtly and significantly burdens the privacy rights of couples engaged in sexual conduct in the bedroom which this court has specifically declared to be impermissible as violative of equal-protection and privacy rights. *See Jegley v. Picado*, 349 Ark. 600, 80 S.W.3d 332 (2002). The State argues that prohibiting foster-parent status due to sexual activity in the bedroom is categorically different from making the conduct a misdemeanor which was the issue in *Jegley*. But is it? In both instances, gay and lesbian couples are saddled with an infirmity due to sexual orientation. To be sure, in the first instance, a crime is the burden. But in the second, gay couples are denied the freedom to act as foster parents for dependent and neglected children. And who are the ultimate losers in this? It is the foster children who will be forced to reside in youth homes because an insufficient pool of willing foster parents is available.

While not denying that Regulation 200.3(2) practices an invidious classification for equal-protection purposes on gay and lesbian couples based on sexual orientation, DHS justifies this classification by arguing that there is a legitimate government interest or rational basis for denying these couples foster-parent

status. DHS's asserted rational basis is that it is in the best interest of foster children who, it contends, will be subject to enhanced stress, ridicule, and dubious role models in a gay or lesbian foster home. And yet DHS presents nothing to support its premise. It simply argues that these foster children will be "guinea pigs," used for experimental purposes, even while it presents nothing in the way of research or studies to support its thesis. Again, all of this is being advocated by DHS while the best empirical data available is the fact that prior to Regulation 200.3(2), gay and lesbian parents were allowed to be foster parents and there is no record of any complaints being lodged against them while serving in those roles. Moreover, based on the foster-care statistics of DHS's Division of Children and Family Services, that division has concluded that it knows of no reason why gay and lesbian couples would be unsuitable to be foster parents.

The trial court's findings of facts as well as the stipulation by the parties undermine any basis for the attack on bedroom privacy occasioned by Regulation 200.3(2). Indeed, the trial court found that being raised by gay and lesbian parents does not increase adjustment problems for children. There is no rational basis in the form of studies or empirical data that sustains the regulation. And the United States Supreme Court as well as this court have made it clear that mere moral disapproval of sexual activity by a group does not qualify as a legitimate reason for an attack on equal protection or privacy rights. *See Lawrence v. Texas*, 539 U.S. 558 (2003) (due process); *Jegley v. Picado, supra* (due process and equal protection). All that DHS has left propping up Regulation 200.3(2) is a moral preference by the Child Welfare Agency Review Board without anything to suggest that foster children will be jeopardized as a result.

In direct response to such government action, this court quoted the United States Supreme Court in *Jegley*:

> . . . [I]f the constitutional conception of "equal protection of the laws" means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest.

349 Ark. at 635, 80 S.W.3d at 352 (quoting *Romer v. Evans*, 517 U.S. 620, 634 (1996) (quoting *Department of Agriculture v. Moreno*, 413 U.S. 528. 534 (1973) (emphasis in original))).

Subsequently, the United States Supreme Court had this to say in *Lawrence v. Texas, supra*:

Our prior cases make two propositions abundantly clear. First, the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice; neither history not tradition could save a law prohibiting miscegenation from constitutional attack. Second, individual decisions by married persons, concerning the intimacies of their physical relationship, even when not intended to produce offspring, are a form "liberty" protected by the Due Process Clause of the Fourteenth Amendment. Moreover, this protection extends to intimate choices by unmarried as well as married persons.

539 U.S. at 577-78 (quoting *Bowers v. Hardwick*, 478 U.S. 186, 216 (1986) (Stevens, J., dissenting)).

There is no question but that gay and lesbian couples have had their equal-protection and privacy rights truncated without any legitimate and rational basis in the form of foster-child protection for doing so. Indeed, in *Jegley*, this court held that privacy rights attending sexual conduct in the bedroom between two consenting adults was a fundamental right under the Arkansas Constitution that required strict scrutiny and a compelling state interest to justify interference with it. Nothing that the Child Welfare Agency Review Board presented to the trial court shows that it had a *compelling* state interest for doing what it did. Certainly, the Board's proffered reasons surrounding best interest of the child are gossamer thin and have no foundation in objective research.

I conclude that the trial court should have struck down Regulation 200.3(2) on equal-protection and privacy grounds as well as separation of powers and erred in not doing so.

For these reasons, I concur in the result reached by the majority.