SLIP OPINION

Cite as 2015 Ark. 116

# SUPREME COURT OF ARKANSAS

No. CV-14-542

| | |
|---|---|
| RAY HOBBS, IN HIS OFFICIAL CAPACITY AS DIRECTOR, ARKANSAS DEPARTMENT OF CORRECTION; and ARKANSAS DEPARTMENT OF CORRECTION<br><br>APPELLANTS/CROSS-APPELLEES<br><br>V.<br><br><br>JASON MCGEHEE, DON DAVIS, STACEY JOHNSON, JACK JONES, TERRICK NOONER, ANDREW SASSER, BRUCE WARD, KENNETH WILLIAMS, and MARCEL WILLIAMS<br><br>APPELLEES/CROSS-APPELLANTS | Opinion Delivered March 19, 2015<br><br>APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT [NO. 60CV-13-1794]<br><br>HONORABLE WENDELL L. GRIFFEN, JUDGE<br><br><br><br><u>REVERSED ON DIRECT APPEAL; AFFIRMED ON CROSS-APPEAL</u>. |

**KAREN R. BAKER, Associate Justice**

Appellants Ray Hobbs, in his official capacity as Director of the Arkansas Department of Correction, and the Arkansas Department of Correction (collectively the "ADC") appeal the decision by the Pulaski County Circuit Court finding that Act 139 of 2013 unconstitutionally violates the separation-of-powers doctrine found in article IV of the Arkansas Constitution because it permits the ADC to select any chemical within a class of chemicals known as barbiturates to effectuate a sentence of death by lethal injection. Because this case involves substantial questions of law concerning the validity, construction, or interpretation of an act of the General Assembly, this court's jurisdiction is proper pursuant to Arkansas Supreme Court Rule 1–2(b)(6). The circuit court ruled that Act 139 violates our

SLIP OPINION

separation-of-powers doctrine because it delegates to the ADC the "absolute discretion" to determine the type of barbiturate to use and sets no guidelines or standards concerning the competence of personnel who will carry out death sentences. We disagree, and hold that Act 139 is not an unconstitutional violation of the separation-of-powers clause found in this state's constitution. We affirm the circuit court's conclusion that Act 139 is not a sentencing statute and, therefore, does not violate our rules against retroactive application of sentencing statutes.

On April 26, 2013, the appellees (collectively "Prisoners"), all of whom are imprisoned within the ADC system and under sentences of death, filed a complaint for declaratory judgment and injunctive relief.[1] The Prisoners asserted six claims in their complaint: (1) Applying Act 139 of 2013 retroactively to their sentences violates the well-settled state-law principle that a sentence must be in accordance with the statutes in effect on the date of the crime; (2) To the extent that it may be applied to them and implemented by the ADC, Act 139 violates the Ex Post Facto Clause of article 1, sections 9 and 10 of the United States Constitution because it creates a significant risk of increased punishment in the form of agony, degradation, serious injury, and/or lingering death as compared to Act 774 of 1983, which was in effect at the time of the Prisoners' crimes; (3) Act 139 violates the separation-of-powers principles embodied in article IV of the Arkansas Constitution because it usurps legislative authority; (4) Act 139 violates the Eighth Amendment to the United States Constitution

---

[1] The complaint was filed on behalf of Jason McGehee, Stacey Johnson, Jack Jones, Bruce Ward, Kenneth Williams, and Marcel Williams. On May 3, 2013, Andrew Sasser, Don Davis, and Terrick Nooner filed a motion to intervene. The circuit court granted the motion to intervene on May 7, 2013.

because the ADC's new lethal-injection procedure entails a substantial risk of wanton and unnecessary infliction of agony, degradation, serious physical injury, and/or lingering death; (5) Act 139 violates the Supremacy Clause of article IV, clause 2 of the United States Constitution and is preempted insofar as it purports to authorize the delivery, receipt, and use of Lorazepam and Phenobarbital; (6) Act 139 violates the separation-of-powers principle embodied in article IV of the Arkansas Constitution because it unlawfully delegates to the ADC standardless discretion with regard to the selection and training of the members of the execution team and with regard to the method by which the drugs are to be injected. A copy of the ADC's lethal-injection protocol was attached to the complaint.

The Prisoners' complaint specifically alleged that in its lethal-injection protocol the ADC selected Phenobarbital, a slow-acting barbiturate, to be used to effectuate death by lethal injection in Arkansas. According to the Prisoners, Act 139 permits the ADC to select from a wide range of drugs and, in exercising its discretion, the ADC selected two drugs, Lorazepam and Phenobarbital, despite the fact that the drugs are "a completely untried combination and quantity," that "will take hours to be injected and to reach their peak effect, that will produce agonizing and degrading effects during the procedure, and that will severely injure and permanently injure—but may not kill—the Prisoners." The Prisoners contended that the statute in effect at the time of their respective crimes required that the death penalty be carried out by "a continuous intravenous injection of a lethal quantity of an ultra-short acting barbiturate in combination with a chemical paralytic agent until the defendant's death." Act of Mar. 24, 1983, No. 774, 1983 Ark. Acts 1804. The Prisoners also protested that Act

139 contained no standard regarding the level of medical training for execution team members and did not provide for specific methods to be used for the injection. The Prisoners contended that Act 139 would permit the ADC to use anyone, medically trained or not, to serve on the execution team and would permit the use of outdated and painful procedures, such as "venous cut downs," to gain access to a vein to administer lethal injections.[2]

During the course of the litigation, the ADC withdrew its lethal-injection protocol that specified the use of Phenobarbital and Lorazepam. Consequently, on June 14, 2013, the Prisoners amended their complaint to include only two facial challenges and abandoned their as-applied challenges. In their amended complaint the Prisoners alleged that (1) Anti-retroactivity principles require a declaration that the Prisoners may not be executed under Act 139, and; (2) Act 139 violates the separation-of-powers doctrine found in the Arkansas Constitution. On June 3, 2013, the ADC responded to the Prisoners' complaint, asserting that Act 139 "constrains ADC's discretion in selecting the lethal drug by requiring the Director to select a 'barbiturate.'" The ADC admitted that Act 139 does not "codify criteria for selection or training of personnel involved with lethal injection," and "does not codify how the ADC should obtain intravenous access." The ADC acknowledged that Act 139 "had not yet been enacted at the time [the Prisoners] were convicted and sentenced," and that "ADC intends to follow Act 139" in carrying out the sentences of death for each Prisoner.

---

[2]In their complaint in intervention, the Prisoners described a "venous cut down" as a "bloody, outdated and extremely painful procedure that involves cutting the subject open with a knife to directly expose his vein," which is "no longer performed in the medical setting at all."

SLIP OPINION

The ADC also pleaded affirmative defenses of sovereign and qualified immunity and failure to state facts upon which relief could be granted.

On September 16, 2013, the Prisoners filed a motion for summary judgment, asserting that there were no genuine issues of material fact remaining and requesting that the circuit court "declare [Act 139] invalid as applied to the Prisoners and unconstitutional on its face, and permanently enjoin its use." In support of their motion, the Prisoners attached the codified version of Act 139, prior versions of the same statute, and an affidavit by Jonathan Groner, M.D., describing the effects of three different classes of barbiturates, the effects of benzodiazepines, and stating that "no other state includes intravenous administration of a benzodiazepine as a part of its lethal injection procedure." In addition, the Prisoners attached a second affidavit, from David Waisel, M.D., describing the effects of barbiturates and benzodiazepines.

The ADC filed a cross-motion for summary judgment on the same date. Attached to its motion were several documents, including: excerpts from the principal brief of the Prisoners in *Hobbs v. Jones*, 2012 Ark. 293, 412 S.W.3d 844; parts of the ADC's lethal-injection protocol; Act 1296 of 2009; Act 139 of 2013; a survey of state and federal method-of-execution statutes; transcript excerpts from a November 30, 2010 hearing and an August 15, 2011 hearing conducted in *Hobbs v. Jones*; excerpts from the briefs filed in *Arkansas Dep't of Correction v. Williams*, 2009 Ark. 523, 357 S.W.3d 867.

On February 21, 2014, the circuit court entered a memorandum opinion and order granting summary judgment in favor of the Prisoners on their claim that Act 139 violates the

separation-of-powers doctrine found in the Arkansas Constitution, but denying summary judgment on their claim that Act 139 could not be applied retroactively. The circuit court stated that the "upshot of this decision is that [the ADC is] enjoined to maintain the status quo and not proceed with executions under [Act 139 of 2013] until the statute is revised and no longer in violation of the separation of powers provision in the Constitution of Arkansas." The circuit court found that "a change in the method of execution does not result in an increase in the quantum of punishment for capital murder, because the punishment, the option of death, remains the same." The circuit court held that "[Act 139] is not a sentencing statute and that it will not be retroactively applied." Regarding the separation-of-powers argument, the circuit court found that Act 139 ran afoul of this court's opinion in *Hobbs v. Jones*, *supra*, because the Act vests the ADC with "absolute discretion" to determine the type of barbiturate to use and sets no guidelines or standards concerning the competence of personnel who will carry out death sentences. The circuit court further opined that "[t]he General Assembly has again abdicated its responsibility by passing to the executive branch the unfettered discretion to determine the chemicals to be used and the qualifications, competence, and standards to be followed for a state execution." The court concluded that Act 139 delegated legislative authority "without giving sufficient guidelines for the use of that discretion, in clear violation of the doctrine of separation of powers set forth in our constitution," and declared that Act 139 was "unconstitutional in its entirety."

On March 21, 2014, the ADC filed a notice of appeal from the circuit court's ruling that Act 139 violated the separation-of-powers doctrine. On March 28, 2014, the Prisoners

filed a notice of cross-appeal from the circuit court's ruling that Act 139 was not a sentencing statute and could be applied to them retroactively.

Typically, when faced with a challenge to the grant of a motion for summary judgment, this court examines the record to determine if genuine issues of material fact exist. *McMullen v. McHughes Law Firm*, 2015 Ark. 15, at 6. However, in a case where the parties agree on the facts, we simply determine whether the appellee was entitled to judgment as a matter of law. *Bakalekos v. Furlow*, 2011 Ark. 505, at 4, 410 S.W.3d 564, 568. When parties file cross-motions for summary judgment, as was done in this case, they essentially agree that there are no material facts remaining, and summary judgment is an appropriate means of resolving the case. *Id.* Matters of law are reviewed de novo. *Nationwide Mut. Fire Ins. Co. v. Citizens Bank & Trust Co.*, 2014 Ark. 20, at 4, 431 S.W.3d 292, 294.

## I. *Direct Appeal*

The ADC contends that the circuit court erred in ruling that Act 139 violates the separation-of-powers doctrine because it delegates to the ADC the authority to decide which drug, within a specific class of drugs, will be used for lethal injection. The Prisoners urge this court to affirm the circuit court's conclusion because the drugs within the class of drugs designated by Act 139 vary greatly in effectiveness, side effects, and the time they take to act.

Acts of the legislature are presumed constitutional and the party challenging the statute has the burden to prove otherwise. *Martin v. Kohls*, 2014 Ark. 427, at 11, 444 S.W.3d 844, 850. If it is possible to construe a statute as constitutional, we must do so. *Paschal v. State*, 2012 Ark. 127, 388 S.W.3d 429. Because statutes are presumed to be framed in accordance

with the Constitution, they should not be held invalid for repugnance thereto unless such conflict is clear and unmistakable. *Id.*

Our state constitution contains a specific separation-of-powers provision, which provides:

> The powers of the government of the State of Arkansas shall be divided into three distinct departments, each of them to be confided to a separate body of magistracy, to-wit: Those which are legislative, to one, those which are executive, to another, and those which are judicial, to another.

> No person or collection of persons, being of one of these departments, shall exercise any power belonging to either of the others, except in the instances hereinafter expressly directed or permitted.

Ark. Const. art. 4, §§ 1, 2. In *Department of Human Services v. Howard*, 367 Ark. 55, 238 S.W.3d 1 (2006), we explained the specific powers delegated to each branch. The legislative branch of the state government has the power and responsibility to proclaim the law through statutory enactments. *Id.* The judicial branch has the power and responsibility to interpret the legislative enactments. *Id.* The executive branch has the power and responsibility to enforce the laws as enacted and interpreted by the other two branches. *Id.* We acknowledge that the doctrine of separation of powers is a basic principle upon which our government is founded, and should not be violated or abridged. *Id.*

Although we have recognized that the legislature cannot delegate its power to proclaim the law to another branch of government, we have also recognized that it can delegate some discretionary authority to the other branches:

> While it is a doctrine of universal application that the functions of the Legislature must be exercised by it alone and cannot be delegated, it is equally well settled that the Legislature may delegate to executive officers the power to determine certain facts, or

the happening of a certain contingency, on which the operation of the statute is, by its terms, made to depend.

. . . .

If the law is mandatory in all it requires and all it determines, it is a legislative act, although it is put into operation by officers or administrative boards selected by the Legislature.

*State v. Davis*, 178 Ark. 153, 156, 10 S.W.2d 513, 514 (1928); *see also Ark. S. & L. Ass'n Bd. v. W. Helena S. & L.*, 260 Ark. 326, 538 S.W.2d 560 (1976) (noting that the legislature cannot delegate its lawmaking power but can delegate if the power is not purely legislative in nature). We have held that the true distinction is between the delegation of power to make the law, which necessarily involves the discretion as to what it shall be, and conferring authority or discretion as to its execution to be exercised under and in pursuance of the law. The first cannot be done. To the latter no valid objection can be made. *Terrell v. Loomis*, 218 Ark. 296, 300, 235 S.W.2d 961, 963 (1951).

Consequently, this court has recognized that such discretionary power may be delegated by the legislature to a state agency as long as reasonable guidelines are provided. *Bakalekos v. Furlow*, 2011 Ark. 505, 385 S.W.3d 810. This guidance must include appropriate standards by which the administrative body is to exercise this power. *Id.* A statute that, in effect, reposes an absolute, unregulated, and undefined discretion in an administrative agency bestows arbitrary powers and is an unlawful delegation of legislative powers. *Id.*

A review of the history surrounding Act 139 provides a helpful starting point in examining the separation-of-powers issue presented in this case. Approved on March 24, 1983, Act 774 of 1983 adopted lethal injection as the mode of execution in this state. Section 1 of Act 774 provided that "[t]he punishment of death is hereafter to be administered by a

continuous intravenous injection of a lethal quantity of an ultra-short-acting barbiturate in combination with a chemical paralytic agent until the defendant's death is pronounced according to accepted standards of medical practice." Act of Mar. 24, 1983, No. 774, 1983 Ark. Acts 1804. Throughout their litigation, the Prisoners have maintained that Act 774 is constitutional because it specifies that the ADC must use a lethal quantity of an ultra-short-acting barbiturate in combination with a chemical paralytic agent and states that the drugs must be delivered by continuous intravenous injection until the condemned is dead. In 2009, the legislature adopted Act 1296. Known as the Methods of Execution Act (MEA), Act 1296 provided, in relevant part:

> (1) The sentence of death is to be carried out by intravenous lethal injection of one (1) or more chemicals, as determined in kind and amount in the discretion of the Director of the Department of Correction.
> (2) The chemical or chemicals injected may include one (1) or more of the following substances:
> > (A) One (1) or more ultra-short-acting barbiturates;
> > (B) One (1) or more chemical paralytic agents;
> > (C) Potassium chloride; or
> > (D) Any other chemical or chemicals, including but not limited to saline solution.
> (3) The condemned convict's death will be pronounced according to accepted standards of medical practice.

Methods of Execution Act, No. 1296, 2009 Ark. Acts 6214. In prior litigation, the Prisoners successfully challenged Act 1296 on the grounds that it violated the separation-of-powers doctrine embodied in our state constitution. *Jones*, 2012 Ark. 293, 412 S.W.3d 844. In *Jones*, this court held that the legislature has abdicated its responsibility and passed to the executive branch, via the ADC, the unfettered discretion to determine all protocol and procedures, including the chemicals to be used, for a state execution. We further held that

the MEA failed to provide reasonable guidelines for the selection of chemicals to be used

during lethal injection and it failed to provide any general policy with regard to the lethal-

injection procedure. *Id.* at 15, 412 S.W.3d at 854.

Subsequently, the legislature adopted Act 139 of 2013. Act 139 provides:

(a) The Department of Correction shall carry out the sentence of death by intravenous lethal injection of a barbiturate in an amount sufficient to cause death.
(b) Before the intravenous lethal injection is administered, the condemned prisoner shall be intravenously administered a benzodiazepine.
(c) The drugs set forth in subsections (a) and (b) of this section shall be administered along with any substances that the manufacturer has mixed with the drugs and any additional substances, such as saline solution, called for in the manufacturer's instructions.
(d) Catheters, sterile intravenous solution, and other equipment used for the intravenous injection of the drugs set forth in subsections (a) and (b) of this section shall be sterilized and prepared in a manner that is safe and commonly performed in connection with the intravenous administration of drugs of that type.
(e) The Director of the Department of Correction shall develop logistical procedures necessary to carry out the sentence of death, including:
    (1) The following matters:
        (A) Ensuring that the drugs and substances set forth in subsections (a) through (d) of this section and other necessary supplies for the lethal injection are available for use on the scheduled date of the execution;
        (B) Conducting employee orientation of the lethal injection procedure before the day of the execution;
        (C) Logistics of the viewing;
        (D) Coordinating with other governmental agencies involved with security and law enforcement;
        (E) Transferring the condemned prisoner to the facility where the sentence of death will be carried out;
        (F) Escorting the condemned prisoner from the holding cell to the execution chamber;
        (G) The identity, arrival, and departure of the persons involved with carrying out the sentence of death at the facility where the sentence of death will be carried out; and
        (H) Making arrangements for the disposition of the condemned prisoner's body and personal property; and
    (2) The following matters pertaining to other logistical issues:
        (A) Chaplaincy services;

11

(B) Visitation privileges;

(C) Determining the condemned prisoner's death, which must be pronounced according to accepted medical standards;

(D) Confirming the type and concentration of the drugs and substances set forth in subsections (a) through (d) of this section when they have been received by the department; and

(E) Establishing a protocol for any necessary mixing or reconstitution of the drugs and substances set forth in subsections (a) through (d) of this section in accordance with the manufacturer's instructions.

(f) The procedures for carrying out the sentence of death and related matters are not subject to the Arkansas Administrative Procedure Act, § 25-15-201 et seq.

(g) The procedures under subdivisions (e)(1) of this section and the implementation of the procedures under subdivisions (e)(1) of this section are not subject to disclosure under the Arkansas Freedom of Information Act of 1967, § 25-19-101 et seq.

(h) The department shall carry out the sentence of death by electrocution if this section is invalidated by a final and unappealable court order.

Act of Feb. 22, 2013, No. 139, 2013 Ark. Acts 557–59.[3]

According to the ADC, six attributes of Act 139 demonstrate that it complies with the

separation of powers doctrine: (1) It provides a general policy with regard to the lethal

---

[3]While uncodified, Act 139 does contain legislative findings. Those findings state:

(a) The laws of Arkansas impose the sentence of death for its most serious offenses. The General Assembly finds it necessary to provide a means of carrying out the sentence of death while also complying with the constitutional prohibition on cruel and unusual punishment.

(b) To address objections to the method of lethal injection previously provided by law, the General Assembly finds that it should adopt a method of lethal injection that uses a barbiturate to bring about the death of the condemned prisoner.

(c) The General Assembly finds that this measure meets those goals and satisfies the separation-of-powers doctrine by setting forth the state's policy and the procedural guidelines for carrying out the sentence of death.

(d) The General Assembly acknowledges that the manufacturers of the drugs set forth in this act may use preservatives or additives and recommend mixing or administering the drugs with sterile solutions such as saline. The General Assembly finds that these uses and recommendations are appropriate and would not conflict with the procedures set forth in this act.

Act 139 of 2009, 554–55.

injection procedure; (2) It requires the sentence of death to be carried out by lethal injection rather than by other methods;[4] (3) It mandates that the lethal injection be intravenous, as opposed to a direct cardiac infusion, intramuscular injection, or other injection procedure that does not involve injection into a vein; (4) It requires the ADC to carry out the procedure by using a barbiturate in an amount sufficient to cause death and limits the ADC's discretion to selecting from a single class of drugs; (5) It mandates that, before the lethal dose of a barbiturate is injected, the ADC must intravenously administer a benzodiazepine,[5] and; (6) It uses the terms "shall" and "must" six different times, including with regard to mandating that the ADC follow the manufacturer's mixing instructions, sterilization of equipment, and the pronouncement of death.

The Prisoners urge this court to affirm the circuit court's finding because they presented uncontested evidence that the term barbiturate applies to a "broad class of pharmaceutical agents with wide ranging properties and effects, including speed of onset and duration." Thus, the Prisoners maintain that based on the delegation in Act 139, the ADC, at its sole discretion, could subject those sentenced to death by lethal injection to a death ranging from a few minutes to an hour or more. Additionally, the Prisoners take issue with the fact that Act 139 does not provide that "death should occur swiftly," which they assert is a provision found in other jurisdictions' lethal-injection statutes. The Prisoners further

---

[4]Act 139 does provide for electrocution in the event that the lethal injection procedures are invalidated by final, unappealable court order.

[5]ADC asserts that benzodiazepines are "a class of drugs known for their anti-anxiety and anti-convulsant properties.

SLIP OPINION

assert that this court's opinion in *Venhaus v. State ex rel Lofton*, 285 Ark. 23, 684 S.W.2d 252 (1985), and *Walden v. Hart*, 243 Ark. 650, 420 S.W.2d 868 (1967), foreclose ADC's argument that minimal guidance will suffice.

In *Venhaus*, this court held that a statute providing that the exact amounts of salaries of probation officers and deputy probation officers were to be set by a circuit judge vested unbridled discretion in the judge and contravened our separation-of-powers doctrine because the statute did not provide any guidance to be used in salary determination. *Id.* at 28, 684 S.W.2d at 255. The statute at issue in that case provided for a range of salary between $15,000 and $20,000, but did not provide for grades or steps based upon training, education, experience, or other fact or thing to be used in the salary determination. *Id.* According to the Prisoners, *Venhaus* stands for the proposition that the legislature may not delegate a range of options to an executive agency without also providing some criteria to guide the agency's choice within the range. We disagree with the Prisoners' broad characterization of our holding in *Venhaus*. Notably, in *Venhaus*, this court never stated that the legislature could not delegate the power to choose from among specific legislatively approved options. Instead, the statute at issue in that case failed to give *any* guidance on numerous factors and, therefore, provided a wide range of options to choose from and no criteria to guide that choice. In contrast, within Act 139 the legislature has provided that the ADC must select a barbiturate and must administer that barbiturate in an amount sufficient to cause death. While we acknowledge that more than one drug may meet this description, the fact remains that the legislature has provided criteria to guide the ADC's exercise of discretion and has limited the

SLIP OPINION

ADC to selecting only from the legislatively approved options: a barbiturate in an amount sufficient to cause death.

Likewise, we find that *Walden v. Hart, supra*, is distinguishable from the present case. In *Walden*, we held that a provision of the then existing Uniform Motor Vehicle Code that defined emergency vehicle but then permitted the chief of police to authorize or designate certain ambulances as emergency vehicles was unconstitutional for delegating legislative powers. Like *Venhaus*, the issue in *Walden* was the complete absence of any guidelines from the legislature. The statute did not provide any guidance regarding the necessary markings or exterior identification of a vehicle, such as lights, sirens, bells, or whistles, and it did not provide any guidance regarding the qualification or abilities of the driver of the vehicle. *Walden*, 243 Ark. at 654, 420 S.W.3d at 871. Thus, the statute gave to the named authorities an "unbridled discretion," to consider any vehicle an emergency vehicle, which we determined was "fatal" under our separation–of–powers doctrine. *Id*. at 652, 420 S.W.2d at 870. However, we acknowledged that had the Legislature "afforded reasonable guidelines, we would have a different situation." *Id*. Here, the legislature has afforded reasonable guidelines by limiting the ADC's discretion to barbiturates, rather than permitting the ADC to consider any drug of any class.

Unlike *Venhaus* and *Walden*, where the statutes at issue contained no guidance or standards for the exercise of discretion, an examination of Act 139 reveals that it provides reasonable guidelines to the ADC in determining the method it will use to carry out the death penalty in Arkansas. Act 139 provides a general framework within which the ADC must

operate and does not place absolute, unregulated and undefined discretion in the ADC. For instance, Act 139 requires intravenous lethal injection of a barbiturate in an amount sufficient to cause death. Thus, the legislature has provided guidance as to (1) the method the ADC must use, intravenous injection; (2) the type or class of drug the ADC must use, a barbiturate; and (3) the amount of the drug the ADC must use, an amount sufficient to cause death. Act 139 further requires that prior to administration of a barbiturate, the ADC must intravenously administer a benzodiazepine and that all drugs be administered per the manufacturer's instructions. Further, Act 139 requires that all catheters, sterile intravenous solution, and other equipment used for the intravenous injection of the drugs set forth to be sterilized and prepared in a manner that is safe and commonly performed in connection with the intravenous administration of drugs of that type. Finally, Act 139 states the General Assembly's policy goal of providing "a means of carrying out the sentence of death while also complying with the constitutional prohibition on cruel and unusual punishment." Act of Feb. 22, 2013, No. 139, 2013 Ark. Acts 555. These provisions provide reasonable guidance for the ADC's exercise of its discretion.[6] Moreover, by providing guidance on the method for

_____

[6]Before leaving this point, we must note that whether Act 139 or the ADC's protocol conforms with the Eighth Amendment's prohibition against cruel and unusual punishment is not at issue in this case. The circuit court's order made no reference to this constitutional guarantee and the Prisoners present no argument in their briefs on this issue. We recognize that the Eighth Amendment is applicable to the States through the Due Process Clause of the Fourteenth Amendment and provides that excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted. *Baze*, 553 U.S. at 47. The Court has explained that to prevail on such a claim there must be a "substantial risk of serious harm," an "objectively intolerable risk of harm" that prevents prison officials from pleading that they were "subjectively blameless for purposes of the Eighth Amendment." *Id*. at 50 (citing *Farmer v. Brennan*, 511 U.S. 825, 842, 846, and n. 9 (1994)). This is an entirely separate inquiry from

carrying out the death penalty, the drugs to be used, the order in which the drugs are to be administered, the amount to be administered, and the general policy for carrying out the death penalty in Arkansas, we find that Act 139 does not violate the separation–of–powers doctrine and is distinguishable from Act 1296, which we struck down in *Jones*.

The circuit court also held that Act 139 was unconstitutional because it does not specify the training and qualifications of the personnel involved with the lethal–injection procedure. In *Baze v. Rees*, 553 U.S. 35 (2008), the Supreme Court of the United States upheld a Kentucky statute that did not specify the drugs or categories of drugs to be used during an execution and did not provide any guidance on the training or qualifications of the personnel involved with the procedure. Like Arkansas, officials with the Kentucky Department of Corrections developed a lethal injection protocol describing the training and qualifications of personnel and the procedures to be followed in carrying out a sentence of death. In fact, the Kentucky statute prohibited physicians from participating in the "conduct of an execution," except to certify the cause of death. *Id*. at 46.

Moreover, our own constitution and precedents do not require the level of detail urged by the Prisoners in order for legislation to satisfy our separation–of–powers doctrine. In *Hooker v. Partin*, 235 Ark. 218, 357 S.W.2d 534 (1962), this court rejected a separation–of–

---

whether an act unconstitutionally delegates legislative authority to the executive branch. Though this court will, on occasion, go to the record to affirm for a different reason, this is done when that alternative reason was raised by a party and developed at the circuit court level. *Hanlin v. State*, 356 Ark. 516, 529, 157 S.W.3d 181, 189 (2004). Here, no Eighth Amendment argument was developed or ruled on below; therefore, we confine our review of the constitutionality of Act 139 to the separation–of–powers issue.

powers challenge to a statute that established the maximum salaries and wages for a maximum number of employees by grades and classes, but permitted the Highway Commission to employ a lesser number of employees and to pay less than the maximum salaries and wages to employees in the various grades and classes. *Id*. at 222, 357 S.W.2d at 538. This court noted that the delegation of this power was "necessary for the orderly and efficient operation of the Highway Department," and that the legislature has the right to delegate the power to determine facts upon which the law makes or intends to make its action depend." *Id*. at 223, 357 S.W.2d at 538. Thus, this court has rejected the Prisoners' contention that an act can never delegate decisions regarding training and qualification of personnel to an agency.

## II. *Cross-Appeal*

The circuit court determined that Act 139 could be applied retroactively to the Prisoners, who were sentenced when Act 774 was in effect. The Prisoners contend that the circuit court erred because there is a presumption against applying sentencing laws retroactively. The ACD urges this court to affirm and relies heavily on this court's opinion in *Arkansas Department of Correction v. Williams*, 2009 Ark. 523, 357 S.W.3d 867, in which this court rejected the argument that Act 1296 was a sentencing statute.

In *Williams*, Frank Williams, Jr., who was under a sentence of death, asserted that Act 1296 could not be applied to him because it was not expressly made retroactive by the General Assembly. Although we acknowledged the well–established rule that a sentence must be in accordance with the statutes in effect on the date of the crime, *see State v. Ross*, 344 Ark. 364, 39 S.W.3d 789 (2001), we rejected Williams's characterization of Act 1296 as a

sentencing statute. *Williams*, 2009 Ark. 523, at 7, 357 S.W.3d at 871. We found that Act 1296 was not a sentencing statute and would not be applied "retroactively," based on the following passage from *Landgraf v. USI Film Products*, 511 U.S. 244, 269–70 (1994):

> A statute does not operate "retrospectively" merely because it is applied in a case arising from conduct antedating the statute's enactment . . . or upsets expectations based in prior law. Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates "retroactively" comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event.

*Williams*, 2009 Ark. 523, at 8, 357 S.W.3d at 871–72.

As in *Williams*, Act 139 does nothing to change the criminal liability or sentences for capital murder in Arkansas. Thus, there was no need for the General Assembly to state that Act 139 may be applied retroactively, because the Act will not be "retroactively" applied but will instead apply to all executions held after enactment. *Id*. at 9, 357 S.W.3d at 872.

We hold that Act 139 does not violate the separation-of-powers principle contained in article 4 of the Arkansas Constitution. The delegation of authority contained within Act 139 is not unfettered and is bounded by reasonable guidelines from the legislature. Therefore we reverse the circuit court's conclusion that Act 139 is unconstitutional. In addition, we hold that Act 139 is not a sentencing statute and, because it will be applied only to executions after its enactment, does not violate our rules against retroactive application of sentencing statutes. Therefore, we affirm the circuit court's findings on this point.

Reversed on direct appeal; affirmed on cross-appeal.

HANNAH, C.J., and DANIELSON and WYNNE, JJ., concur in part and dissent in part.

**ROBIN F. WYNNE, Justice, concurring in part and dissenting in part.** I fully agree with the majority's analysis of the cross-appeal; however, I cannot agree that Act 139 of 2013, the Method of Execution Act (MEA), has remedied the separation-of-powers violations outlined in *Hobbs v. Jones*, 2012 Ark. 293, 412 S.W.3d 844, and I would affirm on direct appeal. Therefore, I respectfully concur in part and dissent in part.

This court has long held that matters of public policy are generally within the purview of the legislature. *Archer v. Sigma Tau Gamma Alpha Epsilon, Inc.*, 2010 Ark. 8, at 8, 362 S.W.3d 303, 308 (citing *Cato v. Craighead Cnty. Cir. Court*, 2009 Ark. 334, 322 S.W.3d 484). As noted by the majority, the legislative branch has the power and responsibility to proclaim the law through statutory enactments. *Dep't of Human Servs. & Child Welfare Agency Review Bd. v. Howard*, 367 Ark. 55, 66, 238 S.W.3d 1, 8 (2006) (quoting *Federal Express Corp. v. Skelton*, 265 Ark. 187, 197–98, 578 S.W.2d 1, 7 (1979)). While the separation-of-powers doctrine prohibits the General Assembly from delegating its power to proclaim the law to another branch of government, this court has held that discretionary power may be delegated by the legislature to a state agency as long as reasonable guidelines are provided. *Bakalekos v. Furlow*, 2011 Ark. 505, at 8, 410 S.W.3d 564, 571. This guidance must include appropriate standards by which the administrative body is to exercise this power. *Id.*

The above has long been the law in this state, and this court acknowledged as much in *Venhaus v. State ex rel. Lofton*, 285 Ark. 23, 28, 684 S.W.2d 252, 255 (1985). In *Venhaus*, the statute at issue provided that the exact amounts of salaries of probation officers were to be set by a circuit judge within the range of $15,000 to $20,000. We held that because the

statute at issue did not provide for grades or steps based upon training, education, experience, or anything else to be used in the salary determination, it vested unbridled discretion in the judge and contravened the separation-of-powers doctrine. *Id.* at 28, 684 S.W.2d 255. Similarly, in *Walden v. Hart*, 243 Ark. 650, 420 S.W.2d 868 (1967), this court held that a provision of the then existing Uniform Motor Vehicle Code permitting the chief of police to authorize or designate certain ambulances as emergency vehicles was unconstitutional for delegating legislative powers. The statute at issue provided no standards for the chief of police to consider, and this court rejected the notion that two provisions in other statutes established sufficient standards for the licensing of an emergency vehicle, writing, "But what other factors are to be considered by him? The legislation does not answer that question. That vacuum creates the constitutional defect." *Id.* at 654, 420 S.W.2d at 871. In both cases, the legislature had provided basic parameters (a salary range in *Venhaus* and requirements that emergency vehicles be equipped with a siren and flashing red lights in *Walden*), but this court held that the statutes still violated our separation-of-powers doctrine. *Venhaus* and *Walden* should inform our decision in the present case.

The crux of this appeal is whether the legislature has provided the requisite "reasonable guidelines" for the ADC to follow in carrying out the death penalty in this state. In *Hobbs v. Jones*, in ruling the MEA of 2009 unconstitutional, this court wrote,

> It is evident to this court that the legislature has abdicated its responsibility and passed to the executive branch, in this case the ADC, the unfettered discretion to determine all protocol and procedures, most notably the chemicals to be used, for a state execution. The MEA fails to provide reasonable guidelines for the selection of chemicals to be used during lethal injection and it fails to provide any general policy with regard to the lethal-injection procedure. Despite the fact that other states may

analyze similar statutes differently according to their respective constitutions, we are bound only by our own constitution and our own precedent.

*Hobbs v. Jones*, 2012 Ark. 293, at 15, 412 S.W.3d 844, 854.

Turning now to the MEA of 2013, I find the same problems that this court found in *Hobbs v. Jones*. The changes that the General Assembly made to the statute following our decision include specifying the class of drugs to be used, stating a general policy goal, and requiring that the equipment used in the lethal injection be sterilized and prepared in a manner that is safe and commonly performed in connection with the intravenous administration of drugs of that type. As explained below, these changes fail to provide the type of reasonable guidelines required under our separation-of-powers jurisprudence.

Regarding the chemicals to be used, the MEA of 2013 provides that the ADC is to first administer a benzodiazepine, followed by "a barbiturate in an amount sufficient to cause death." Thus, the legislature has narrowed the lethal drug to be used to any drug in the class of drugs known as barbiturates.[1] However, as explained in the affidavits submitted by the Prisoners in support of their motion for summary judgment, the term "barbiturates" refers to a class of drugs with widely varying effects on the body. According to the affidavits, barbiturates act to depress a person's central nervous system. They are classified depending on the length of time of the drug's onset and how long those effects last; they are generally

---

[1] I note that Act 774 of 1983, which governed capital-punishment procedures in Arkansas from 1983 until 2009, required "a continuous intravenous injection of a lethal quantity of an ultra-short-acting barbiturate in combination with a chemical paralytic agent." The current version of the MEA requires neither that the injection be continuous, nor that the barbiturate be ultra-short-acting.

classified as ultra-short-acting, short-acting, intermediate- or medium-acting, or long-acting. Ultra-short-acting barbiturates can cause a person to lose consciousness within seconds, while a long-acting barbiturate may take considerably longer to take effect. Given the wide range of barbiturates, the General Assembly's delegation to the ADC the decision of which particular type of barbiturate—ultra-short-acting, short-acting, intermediate-acting, or long-acting—to use in carrying out lethal injections, without providing reasonable guidelines, violates our separation-of-powers doctrine.

The general policy provided by the General Assembly with regard to the MEA is contained in Act 139's legislative findings, which provide in pertinent part, "The General Assembly finds it necessary to provide a means of carrying out the sentence of death while also complying with the constitutional prohibition on cruel and unusual punishment." Act of February 20, 2013, No. 139, § 1(a), 2013 Ark. Acts 554, 554. In *Hobbs v. Jones*, we rejected the ADC's argument that reasonable guidance could be found in the prohibition on cruel and unusual punishment in the Eighth Amendment and our state counterpart, Ark. Const. art. 2, § 9. We held that where the General Assembly has delegated its legislative authority to another branch of government but failed to provide sufficient guidance, "the doctrine of separation of powers has been violated and other constitutional provisions cannot provide a cure." *Id.* at 15, 412 S.W.3d 854.

Here, the General Assembly's finding that it is necessary to comply with the constitutional prohibition on cruel and unusual punishment does not provide any additional guidance to the ADC beyond that which the federal and state constitutions already provide.

It does not cure the separation-of-powers violation inherent in allowing the ADC, part of the executive branch, the unfettered discretion to determine how the death penalty will be carried out—subject only to the requirements that it be by intravenous injection of a barbiturate, preceded by a benzodiazepine, and within the constraints of the Eighth Amendment. I note that other states have seen fit to provide the kind of reasonable guidelines that Act 139 lacks. For example, Ohio law provides for "a lethal injection of a drug or combination of drugs of sufficient dosage to *quickly and painlessly* cause death." Ohio Rev. Code Ann. § 2949.22(A) (emphasis supplied). Kansas law provides that the death penalty shall be "by intravenous injection of a substance or substances in a quantity sufficient to cause death in a *swift and humane* manner." Kan. Stat. Ann. § 22-4001(a) (emphasis supplied).

In sum, I do not believe the General Assembly has provided the necessary guidance to the ADC in choosing the method to be used in carrying out capital punishment in this state. As it now stands, the ADC, not the General Assembly, will decide fundamental questions regarding how a sentence of death will be carried out.

I concur in part and dissent in part.

HANNAH, C.J., and DANIELSON, J., join.

*Josh Lee*, Federal Public Defenders Office; and *Jeff Rosenzweig*, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *David A. Curran*, Deputy Att'y Gen., and *Jennifer L. Merritt*, Ass't Att'y Gen., for appellee.