ARKANSAS TOBACCO CONTROL BOARD *v.*
SANTA FE NATURAL TOBACCO COMPANY, Inc.

04-273                                     199 S.W.3d 656

Supreme Court of Arkansas
Opinion delivered December 9, 2004

*Mike Beebe*, Att'y Gen., by: *Arnold M. Jochums*, Ass't Att'y Gen., for appellant.

*Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.*, by: *Leigh Anne Shults*; and *Enns & Archer LLP*, by: *Rodrick J. Enns*, for appellee.

ANNABELLE CLINTON IMBER, Justice. This case involves the judicial review of a decision by Appellant Arkansas Tobacco Control Board ("the Board") to deny the petition of Appellee Santa Fe Natural Tobacco Company ("Santa Fe") for a retail cigarette and tobacco permit for its New Mexico and North Carolina locations. The Board based its denial on its interpretation of Ark. Code. Ann. § 26-57-203(11) (Repl. 1997) as requiring a physical location in Arkansas for the sale of cigarettes. The only issue in this case is the propriety of the Board's interpretation of that statutory provision, which issue is a matter of first impression for this court. Thus, we have jurisdiction pursuant to Ark. Sup. Ct. R. 1-2(b)(1).

The Arkansas Tobacco Control Board issues and renews retail cigarette licenses pursuant to The Tobacco Act, Ark. Code. Ann. §§ 26-57-201 *et seq.* (Repl. 1997). As Santa Fe is a licensed wholesaler of cigarettes in Arkansas, it sells cigarettes to retailers in Arkansas, who then sell the cigarettes to consumers. Since 1996, Santa Fe has also been licensed as a retailer in Arkansas and has sold cigarettes to Arkansas smokers by direct mail. In 2001, however, the Board denied Santa Fe's application for renewal of its retail cigarette permits, stating that the Board staff had discovered that Santa Fe's locations were not in Arkansas, and the company was in violation of the Board's interpretation of § 26-57-203(11) as requiring a physical counter location in Arkansas. Santa Fe filed an action in Pulaski County Circuit Court seeking judicial review of

the Board's decision and a declaratory judgment on the constitutionality of the statute. The circuit court found that the Board incorrectly interpreted the statute as limiting retail sales to physical locations in the state. The court further held that an interpretation of the statute as barring direct-to-consumer sales of cigarettes would violate the dormant Commerce Clause of the United States Constitution. The Board filed a timely notice of appeal. We agree with the Board's interpretation of section 26-57-203(11) and reverse the circuit court.

This case turns on an analysis of Ark. Code Ann. § 26-57-203(11) (Repl. 1997), which defines retailer as "any person who purchases tobacco products from licensed wholesalers for the purpose of selling them over the counter at retail to consumers." The Board contends the phrase "over the counter" in this provision requires cigarette retailers to sell from a physical location in Arkansas. Sante Fe, on the other hand, argues that such an interpretation is contrary to the common interpretation of the phrase "over the counter" and is a violation of the dormant Commerce Clause. We review issues of statutory interpretation *de novo. Brewer v. Fergus*, 348 Ark. 577, 79 S.W.3d 831 (2002).

## 1. Statutory Construction

The basic rule of statutory construction to which all interpretive guides must yield is to give effect to the intent of the Legislature. *American Casualty Company v. Mason*, 312 Ark. 166, 647 S.W.2d 392 (1993). Where the language of a statute is plain and unambiguous, we determine legislative intent from the ordinary meaning of the language used. In considering the meaning of a statute, we construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. *Bank of Eureka Springs v. Evans*, 353 Ark. 438, 109 S.W.3d 672 (2003). We construe the statute so that no word is left void, superfluous, or insignificant; and meaning and effect are given to every word in the statute if possible. When a statute is ambiguous, we must interpret it according to the legislative intent. *Id.* Our review becomes an examination of the whole act. We reconcile provisions to make them consistent, harmonious, and sensible in an effort to give effect to every part. We also look to the legislative history, the language, and the subject matter involved. *Id.*

■ In this case, we must discern the meaning of the phrase "over the counter" as applied to cigarette sales. Although a definition of the phrase is not included in the Act, "over-the-counter" is defined in *Webster's Third New International Dictionary (2002)* as:

> **1 a :** not traded on an organized securities exchange : traded in direct negotiations between buyers and sellers or their representatives : unlisted **b :** not effected on an organized securities exchange
>
> **2 :** capable of being sold legally without the prescription of a physician, dentist, or veterinarian.

*Id.* at 1611. Clearly, the dictionary applies the phrase "over-the-counter" to *only* the sale of stocks or securities (in part 1) and drugs (in part 2).[1] These definitions, when applied to the sale of cigarettes, are ambiguous. Thus, we must try to discern what the legislature intended when it passed the statute.

■ To reiterate, in determining the legislative intent, we review the entire act and reconcile the provisions to make them consistent, harmonious, and sensible in an effort to give effect to every part. *Bank of Eureka Springs v. Evans, supra.* Notably, the statute repeatedly suggests retailers will be located within Arkansas. First, section 26-57-203(7) defines "manufacturer" as "any person who produces any tobacco product for sale and includes, but is not limited to, importers and distributors who deal in tobacco products as manufacturers and who are required under this sub-chapter to sell only to licensed wholesalers or *licensed retailers located in Arkansas.*" Ark. Code Ann. § 26-57-203(7) (Repl. 1997) (Emphasis added). Section 26-57-203(19) allows an Arkansan doing business in an adjoining city to qualify as a wholesaler if "that person is regularly engaged in the sale of tobacco products to *licensed retailers within Arkansas* . . . ." Ark. Code Ann. § 26-57-203(19) (Repl. 1997). Section 26-57-234(a)(6) directs the retailer to allow inspection of "his stock of merchandise and premises, including any room or building used in connection with his business." As such, the statute additionally indicates that the legislature intended for retailers to conduct sales from a location within the State, as

---

[1] Similarly, the cases cited by Sante Fe on the common usage of the phrase "over the counter" are all cases dealing with the sale of stocks or drugs.

inspection of merchandise and premises of retailers outside the state would be a difficult task for the Arkansas Tobacco Control Board. Ark. Code Ann. § 26-57-234(a)(6) (Repl. 1997).

■ Furthermore, notwithstanding Santa Fe's argument to the contrary, the inclusion of an explicit residency requirement for *wholesalers* in the original drafting of the statute does not necessarily suggest that the legislature did not intend a residency requirement for *retailers*. In fact, noting the fundamental differences in retailers and wholesalers, the legislative silence actually lends more credibility to the Board's interpretation. The underlying rationales, such as the ability to collect taxes and inspect goods for contamination, which compelled the legislature to enact a residency requirement for wholesalers, are just as powerful when applied to retailers. However, arguably, the legislature could have assumed retailers would be physically located in Arkansas, making an explicit statement on the residency of a retailer unnecessary, and in fact redundant. In 1977, when the statute was enacted by the legislature, such an assumption would have made sense. It is only after the technological developments of the last twenty-five years that new and different avenues for the marketing of goods to consumers have emerged. In 1977, when the statute was originally drafted, consumers would simply drive to their local grocery store or gas station to purchase cigarettes. Unlike modern-day consumers, consumers in 1977 were not given the option to e-mail or fax an order to an out-of-state retailer. By contrast, the legislature would have been aware that it was possible and even probable that wholesalers would be located outside of the state and would ship goods into the state to retailers for sale. Thus, while the legislature made a specific residency requirement for wholesalers, we conclude based on our review of the entire statutory scheme that there is also an implied residency requirement for retailers.

## 2. *Dormant Commerce Clause*

Santa Fe also argues that a requirement making retailers sell cigarettes from physical locations within Arkansas violates the dormant Commerce Clause of the United States Constitution. The Commerce Clause of the Constitution empowers Congress to "regulate Commerce . . . among the several states," U.S. Const. Art. 1, § 8, cl. 2, and "has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on [interstate] commerce." *South-Central Tim-*

ber Dev., Inc., v. Wunnicke, 467 U.S. 82, 87 (1984). The United States Supreme Court has adopted a two-part test in analyzing state regulations under the dormant Commerce Clause. When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, the Supreme Court has generally struck down the statute without further inquiry. *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573 (1986). However, when the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). Thus, the first crucial question in the instant case is whether requiring retailers to have a physical location inside the state discriminates against interstate commerce.

As Santa Fe correctly notes, we have twice previously struck residency requirements for tobacco wholesalers as unlawfully discriminating against interstate commerce. *Wometco Services, Inc. v. Gaddy*, 272 Ark. 452, 616 S.W.2d 466 (1981); *Ragland v. McLane Company, Inc.*, 287 Ark. 216, 697 S.W.2d 892 (1985). In *Ragland*, we characterized the statute in question as facially discriminatory and stated, "the statutory scheme under consideration is not merely a burden on interstate commerce, it brings tobacco commerce to a halt at our borders. . . ." *Id.* at 218, 697 S.W.2d at 894. In contrast to the residency requirements for wholesalers, a residency requirement for retailers would not "bring tobacco commerce to a halt at our borders," as out-of-state wholesalers such as Santa Fe can sell their products to in-state retailers. Moreover, out-of-state retailers can simply establish a physical location within Arkansas from which to sell cigarettes. Thus, as opposed to the provision in *Wometco* and *Ragland* where the Santa Fe cigarettes could not have been for sale in Arkansas, the current provision still allows the cigarettes to be sold in Arkansas and merely regulates the sales of all cigarettes.

Furthermore, the statute applies equally to in-state retailers and out-of-state retailers. In its July 19, 2001 Order, the Board stated, "Only sales that are made face-to-face can provide the protection that is intended by these statutes." Thus, *any* sale of cigarettes in the state of Arkansas must be made in a face-to-face transaction at a physical location. All retailers, both in-state and

out-of-state, will be required to maintain a physical location in Arkansas and to conduct all their sales from that location.[2] As the statute regulates in-state and out-of-state retailers equally, we hold that it is not facially discriminatory.

██ Moreover, the statute does not discriminate against interstate commerce in its effects. Though the Supreme Court has recognized that a facially-neutral statute can still be discriminatory if its effects discriminate against out-of-state retailers, *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333 (1977), the Arkansas statute does not suggest such discrimination. In *Hunt*, the Court was faced with a North Carolina statute that mandated that all graded apples follow the USDA grading system. While, as here, the statute applied evenhandedly to interstate retailers and in-state retailers, the North Carolina restriction placed a large burden on Washington State retailers, who used a different grading system and would be forced to conform to the North Carolina system by one of several costly methods or not grade their apples sold in North Carolina. Furthermore, as Washington had adopted an arguably superior grading system, the North Carolina regulation operated to "strip from the Washington apple industry the competitive and economic advantages it ha[d] earned for itself through its expensive inspection and grading system." *Id.* at 351. Because North Carolina apple growers and dealers were already using the USDA grading system, the law had no effect on their practices. Due to this disparate impact against the Washington apple dealers, the Court found the state "ha[d] the practical effect of not only burdening interstate sales of Washington apples, but also discriminating against them." *Id.* at 350. Conversely, the Arkansas statute at issue in this case places the same burden of maintaining a physical location on all cigarette retailers. While it is true that out-of-state retailers like Santa Fe who previously did not have a physical location will now be forced to set up such a location, the same is true of any Arkansas retailers who does not have a physical location. Similarly, neither Arkansas nor out-of-state retailers who have established physical locations will be affected by the Board's interpretation. The statute does not have a disparate impact on out-of-state retailers but affects *all* retailers who do not currently

---

[2] Consequently, Santa Fe's argument that the Board's interpretation allows retail permit holders to ship cigarettes directly to consumers is unfounded.

maintain a physical location, regardless of their classification as in-state or out-of-state. We therefore hold that the statute does not discriminate in its effects.

■     Because the statute is neither facially discriminatory nor discriminatory in its effect, we must follow the balancing test stated in *Pike v. Bruce Church, supra.* In *Pike,* the Supreme Court stated,

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.

*Pike v. Bruce Church,* 397 U.S. at 142. Here, the legislative purpose can be found in Ark. Code Ann. § 26-57-202, which establishes the legislative findings and purposes. Section 26-57-202 states:

> (a) It is recognized, found, and determined by the General Assembly that:
>
> (1) The Surgeon General of the United States has determined that the smoking of cigarettes is detrimental to the health of the smoker;
>
> (2) The Arkansas General Assembly had already recognized this hazard many years ago when it enacted § 5-27-227 regulating the sale of tobacco to minors, §§ 20-27-201 – 20-27-703 establishing a policy for public smoking, and this subchapter to provide for close supervision ad control of the sale of cigarettes and other tobacco products;
>
> (3) The state has a very valid governmental interest in preserving and promoting the public health and welfare of its citizens; and
>
> (4) It is the responsibility of the General Assembly to enact legislation to protect and further this essential governmental interest.
>
> (b) It is therefore the intent of this subchapter to:
>
> (1) Provide for the close supervision and control of the licensing of persons to sell cigarettes and other tobacco products in this state in order to assure that cigarettes and other tobacco products distrib-

uted in the state are fresh, not contaminated, and are properly taxed, stamped, stored, and distributed only to persons authorized to receive these products; and

(2) Impose licenses, fees, taxes, and restrictions on the privilege of dealing in or otherwise doing business in tobacco products in order to promote the public health and welfare of the citizens of this state and to protect the revenue collection procedures incorporated within this subchapter.

Ark. Code Ann. § 26-57-202 (Repl. 1997). As this section notes, the legislature has advanced an interest in the protection of minors from being sold cigarettes illegally. Though we previously denounced this interest in *Wometco, supra,* and *Ragland, supra,* as not a legitimate aim of the statute, the legislature has enacted significant changes in the statutory scheme since those cases were decided. For example, the legislature created the Arkansas Tobacco Control Board, which is charged with the responsibility of promulgating regulations for the proper enforcement and implementation of the tobacco laws, including licensing of wholesalers and retailers. Ark. Code Ann. § 26-57-256 (Repl. 1997). Additionally, amendments to the Arkansas Sales to Minors Act have instituted increasingly stringent requirements to curb the sale of cigarettes to minors and to punish violations of the Act. In 1991, the legislature made significant additions to Ark. Code Ann. § 5-27-227, which originally contained only one provision reading, "It shall be unlawful for any person, other than the parent or guardian, to give, barter or sell to a minor under eighteen (18) years of age, tobacco in any form or cigarette papers." Ark. Code. Ann. § 5-27-227 (Repl. 1987). The 1991 amendment added the following six sections:

(b) It shall be unlawful for any person who has been issued a permit or a license under the Arkansas Tobacco Products Tax Act of 1977, § 26-57-201 et seq., as amended, to fail to display prominently, at each retail sales counter or each vending machine, a sign that meets the following requirements:

(1) The sign shall contain in red lettering at least one-half inch (1/2") high on a white background "IT IS A VIOLATION OF THE LAW FOR CIGARETTES OR OTHER TOBACCO PRODUCTS TO BE SOLD TO A PERSON UNDER THE AGE OF 18" and

(2) The sign shall include a depiction of a pack of cigarettes at least two inches (2") high defaced by a red diagonal diameter of a surrounding red circle

(c) It shall be unlawful for any manufacturer whose tobacco products are distributed in this state and any person who has been issued a permit or license under the Arkansas Tobacco Products Tax Act of 1977, § 26-57-201 et seq., to distribute free samples of any tobacco product or coupons that entitle the holder of the coupon to any free sample of any tobacco product;

(1) In or on any public street or sidewalk within five hundred feet (500 ft.) of any playground, public school, or other facility when such facility is being used primarily by persons under eighteen (18) years of age for recreational, education, or other purposes; or

(2) To any person under eighteen (18) years of age.

(d)(1) Except as provided in subdivision (d)(2) below, it shall be unlawful for any person who owns or leases tobacco vending machines to place a tobacco vending machine in a public place. For purposes of this subdivision, "public place" means a publicly or privately owned place to which the public or substantial numbers of people have access.

(2) Tobacco vending machines may be placed in restricted areas within a factory, business, office, or other structure to which members of the general public are not given access; in permitted premises which have a permit for the sale of [sic] dispensing of alcoholic beverages for on-premises consumption which restrict entry to persons age twenty-one (21) or older; or places where the vending machine is under the supervision of the owner or an employee of the owner.

(e) Any person who violates any of the provisions in this section shall be deemed guilty of a misdemeanor and subject to the following penalties:

(1) A fine of one hundred dollars ($100) for the first violation;

(2) A fine of two hundred fifty dollars ($250), plus revocation and suspension of the permit or license to distribute or sell tobacco products from the site and vending machine for seven (7) days where the violation occurred, for a violation occurring within two (2) years of the first violation

(3) A fine of five hundred dollars ($500), plus revocation and suspension of the permit or license to distribute or sell tobacco products from the site and vending machine for not less than one (1) month nor more than six (6) months, for a third violation occurring within two (2) years of the first violation;

(4)(A) A fine of one thousand dollars ($1,000), plus revocation and suspension of the permit or license to distribute or sell tobacco products from the site and vending machine for not less than nine (9) months nor more than eighteen (18) months, for each additional violation occurring within two (2) years of the first violation;

(B) Upon any revocation or suspension of a permit or license under the provisions of subsection (f) of this section, the person shall not be issued any new permit or license to distribute or sell tobacco products during the period of suspension or revocation.

(f) In addition to the penalties in subsection (e) of this section, upon the fourth or subsequent violation of subsection (a) within a two-year period, all of that person's licenses or permits to distribute or sell tobacco products at all sites, locations, and vending machines shall be suspended or revoked and shall not be renewed for a period of not less than nine (9) nor more than eighteen (18) months. Further, that person shall not be issued any new permit or license for not less than nine (9) nor more than eighteen (18) months. It shall be a defense to the penalty imposed under this subsection if the person affirmatively demonstrates that the person has an effective system in place to prevent violations of the prohibition of subsection (a).

(g) The person convicted of violating any provision of this section whose permit or license to distribute or sell tobacco products is suspended or revoked shall, upon conviction, surrender to the court all such permits or licenses, and the court shall transmit those permits and licenses to the Director of the Department of Finance and Administration to suspend or revoke, and not renew, the person's permit or license to distribute or sell tobacco products, and not to issue any new permit or license to that person for the period of time determined by the court in accordance with this section.

Ark. Code Ann. § 5-27-227 (Supp. 1991). This amendment constituted a dramatic expansion of the Act. The added sections — the requirement of a prominent sign, the addition of a fine for a violation

of the Act, and location restrictions for vending machines — are all aimed at decreasing access to cigarettes for minors. These substantial changes to the statutory scheme signify an appreciable shift in the import of the legislative purpose of preventing the sale of tobacco to minors. Moreover, the legislature has shown its dedication to this purpose by continuing to strengthen the regulations that discourage the sale of tobacco to minors. In 1999, the legislature amended section 5-27-227, making several notable changes to the law. Ark. Code Ann. § 5-27-227 (Supp. 1999). For example, the amended section makes it unlawful for *any* person to provide tobacco products to minors, whereas the old section excepted parents and guardians. Ark. Code Ann. § 5-27-227(a). The new section also holds minors themselves accountable, by making it unlawful for minors to use, possess, purchase or attempt to purchase tobacco, with limited exceptions for minors acting within the scope of their employment. Ark. Code Ann. § 5-27-227(b). Most significantly, the 1999 amendment removed the notation that violations were "misdemeanors" and provided harsher penalties for violations. Ark. Code Ann. § 5-27-227(i)(1). Under the most recent version of the statute, the minimum fine is two-hundred and fifty dollars ($250), and the two-year period for measuring cumulative violations has been increased to four years. Ark. Code. Ann. § 5-27-227(i)(1) (Supp. 2003). Thus, since 1985, the statute has grown from a one-section prohibition on sales with an exception for parents or guardians of the minor to a complete statutory scheme with harsh fines and penalties that holds retailers, parents and guardians, and the minor accountable. It is impossible to look at these legislative changes without recognizing that the governmental interest in protecting minors from cigarettes has changed since our decisions in *Wometco, supra,* and *Ragland, supra.* In enacting the foregoing amendments to the Arkansas Sales to Minors Act, it is clear that the legislature has explicitly expressed a substantial governmental interest in the prevention of sale of tobacco to minors.

Santa Fe further argues that the Board's interpretation will not significantly curb the purchase of tobacco by minors. When evaluating a facially-neutral statute, however, the only question is whether the regulation is rationally related to the achievement of the statutory purpose. *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 463 (1981). As in *Minnesota v. Clover Leaf Creamery*, the appellees in this case do not seem to challenge the theoretical connection between the direct sale of cigarettes and minors' access to tobacco. Instead, they are challenging the em-

pirical evidence presented at the Board hearing, arguing that direct sales are not a primary method used by minors to purchase cigarettes. Yet, "states are not required to convince the courts of the correctness of their legislative judgments." *Minnesota v. Clover Leaf Creamery, Co.*, 449 U.S. at 464. Here, Santa Fe only requires the purchaser to submit a *photocopy* of the front and back of a government-issued identification as verification of age. Even Santa Fe's vice-president of distributing admitted it would be easy for a minor to simply submit a photocopy of a fake identification. While there was testimony that only two percent of underage smokers purchased cigarettes through this manner, the legislature nonetheless has the right to take measures to close off that avenue for minors. *Id.* at 466 ("This Court has made clear that a legislature need not 'strike at all evils at the same time or in the same way. . . a legislature may implement [its] program step by step . . . adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations.' "). Likewise, the Second Circuit Court of Appeals, when addressing a similar statute, has noted that, "the prevention of even this small percentage of cigarette sales to minors constitutes a putative local benefit that is sufficient to survive the *Pike* balancing test." *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200, 217 (2d Cir. 2003).

■ Having recognized the governmental purpose and benefits, we now turn to the burden this interpretation places on interstate commerce. Although we recognize that the Board's interpretation will place some burden on retailers, we do not believe this burden is sufficient to invalidate the statute under the dormant Commerce Clause. Though there was testimony that the Board's interpretation would "severely hamper [Santa Fe's] ability to market [its] product in Arkansas," Santa Fe cigarettes are currently carried by at least 40 retailers within Arkansas. In this case, the burden on commerce is notably less than the burden in *Exxon Corp. v. Maryland*, 437 U.S. 117 (1978), where the Court upheld a Maryland gasoline regulation, despite evidence that the requirements would force at least three refiners to stop selling entirely in Maryland. Here, Santa Fe cigarettes will still be available and sold in Arkansas. Based upon the Supreme Court's holding in *Exxon*, we conclude that this burden is not sufficient to outweigh the State's significant interest in limiting the sale of cigarettes to minors. Accordingly, we hold that the Board cor-

rectly interpreted Ark. Code Ann. § 26-57-203(11) to require cigarette retailers to sell face-to-face and such interpretation does not violate the dormant Commerce Clause. The decision of the circuit court is therefore reversed.

Circuit Court Reversed; Arkansas Tobacco Control Board Affirmed.

BROWN, J., concurs.

ROBERT L. BROWN, Justice, concurring. I concur with the majority opinion and particularly am in agreement that the General Assembly has enacted significant measures to curb the purchase of tobacco by minors. The over-the-counter legislation is one such effort. See Ark. Code Ann. § 26-57-203(11) (Repl. 1997). Contrary to the assertion by Santa Fe, I am convinced that direct-mail sales of tobacco products to minors are more difficult to police than over-the-counter sales where the seller and customer meet face-to-face. Accordingly, the public policy in favor of face-to-face sales is one of singular importance. That public policy justifies, in my opinion, the added regulation for tobacco sales in Arkansas.

The one reservation I have, regarding the Board's enforcement of § 26-57-203(11), concerns whether in-state Arkansas retailers with fixed locations are engaging in direct-mail sales to Arkansas customers. The record is murky on this point. Obviously, if Santa Fe and other out-of-state retailers are foreclosed from direct-mail sales, in-state retailers should suffer the same prohibition. Otherwise, the spectre of discrimination and protectionism rears its head. It would not ring true to permit an Arkansas retailer to engage in direct-mail sales to customers in Arkansas simply because the retailer has a fixed location in this state, when out-of-state concerns are not afforded the same opportunity. To the extent in-state direct-mail sales are transpiring, the burden was on Santa Fe to illuminate that point. My reading of the briefs and record tells me it is only guesswork at this point as to whether in-state, direct-mail sales are indeed taking place.

On the overarching issue of state regulation of out-of-state retailers, the United States Supreme Court is hearing three cases this term involving the Commerce Clause and whether out-of-state shipments of alcohol into a state that allows sales only through state-licensed retailers violates that clause. *See Swedenburg v. Kelly*, 358 F.3d 223 (2d Cir. 2004), *cert. granted*, 124 S. Ct. 2391 (U.S. May 24, 2004) (No. 03-1274); *Granholm v. Heald*, 342 F.3d 517

(6th Cir. 2003), *cert. granted*, 124 S. Ct. 2389 (U.S. May 24, 2004) (No. 03-1116); *Michigan Beer & Wine Wholesalers Ass'n v. Heald*, 342 F.3d 517 (6th Cir. 2003), *cert. granted*, 124 S. Ct. 2389 (U.S. May 24, 2004) (No. 03-1120). In those cases, protection of minors is also an issue. Hence, what constitutes an impermissible burden on commerce in the context of tobacco and alcohol is an area of topical concern where it is anticipated that the law will soon be clarified.