PHILLIP T. WHITEAKER, Judge
Josue Tovias appeals from a Washington County Circuit Court order terminating his parental rights to JT, born September 25, 2012.[1] On appeal, Tovias argues that the trial court erred in terminating his parental rights because (1) the Arkansas Department of Human Services (DHS) failed to establish he was a parent for purposes of satisfying the statutory-grounds requirement for termination and (2) there was insufficient evidence of potential harm to satisfy the best-interest requirement for termination. On the record as presented to us, we must reverse because there is no evidence that Tovias's status as a "legal father" falls within the statutory definition of a parent for purposes of the aggravated-circumstances ground for termination.
I. Factual and Procedural History
We provide the following review of the factual and procedural history for an understanding of our analysis. In January 2018, Tovias was living with his girlfriend, Melissa Miranda; her son, JT; and her four other children.[2] Both Miranda and Tovias were arrested on charges related to the abuse and neglect of the children, at which point the children were left without a caregiver. As a result of the abuse and neglect allegations and the absence of a caregiver, DHS exercised a seventy-two-hour hold on all the children and filed a petition for emergency custody and dependency neglect alleging that the children were dependent-neglected. Tovias was not named as a party in the petition or in the ex parte order for emergency custody.[3]
After the children's removal, the court conducted a probable-cause hearing. The court heard evidence of the numerous criminal charges that had been filed against both Miranda and Tovias. Specifically as to Tovias, the court was informed that he had been arrested and charged with second-degree domestic battering, aggravated assault on a family or household member, first-degree endangering the welfare of a minor, tampering with physical evidence, kidnapping, terroristic threatening, and permitting child abuse. The court recognized Tovias as the putative father of JT but did not order DNA testing.
The court conducted an adjudication hearing in March 2018, in which it found that the children were dependent-neglected as a result of abuse and neglect. The court specifically identified Miranda as the perpetrator of the "horrific abuse" inflicted on one of JT's siblings and ordered the *623 goal of the case to be reunification with a concurrent goal of adoption. The court again recognized Tovias as the putative father of JT, found that he had established significant contacts with JT, and concluded that his putative parental rights had attached. Despite these findings, the court once again failed to order DNA testing.
DHS subsequently filed a motion to terminate reunification services.[4] At the hearing on the motion, the court found that Tovias was the "legal father" of JT and ordered the clerk to add him to the style of the case.[5] Our review of the no-reunification order reveals no basis for how this determination was made-there is no mention of any evidence of any DNA testing or any acknowledgment of paternity in the order.
Immediately following the no-reunification-services hearing, the court conducted a permanency-planning hearing. The order filed thereafter is perplexing. The court clearly found that the permanent goal for JT was adoption with DHS filing a petition for termination of parental rights. The court again clearly found Tovias to be JT's "legal father" and that he was entitled to appointed counsel at the hearing to terminate parental rights. This clarity, however, is clouded by language in that same sentence indicating that counsel would be appointed if the "putative" parent requested it. So, in the very same sentence , the court referred to Tovias as both the "putative father" and the "legal father."
DHS filed its petition to terminate parental rights in which it identified Tovias as the "legal father" of JT, alleged that termination was in the best interest of the children, and listed aggravated circumstances as the statutory ground for termination.[6] After a termination hearing,[7] the trial court found that DHS had proved aggravated circumstances by clear and convincing evidence and that termination was in JT's best interest. Tovias appeals both the court's statutory-grounds and its best-interest findings.
II. Standard of Review and Applicable Law
Our supreme court has held that the termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents. Earls v. Ark. Dep't of Human Servs. , 2017 Ark. 171, 518 S.W.3d 81. We, therefore, review termination-of-parental-rights cases de novo. Harjo v. Ark. Dep't of Human Servs. , 2018 Ark. App. 268, 548 S.W.3d 865. To terminate parental rights, the court must find the existence of at least one statutory ground, in addition to a finding that it is in the child's best interest to terminate parental rights. Ark. Code Ann. § 9-27-341 (Supp. 2017); Kohlman v. Ark. Dep't of Human Servs. , 2018 Ark. App. 164, 544 S.W.3d 595. A trial court's findings on statutory grounds and best interest are factual findings, and we will not reverse *624 the trial court's ruling unless its findings are clearly erroneous. Sharks v. Ark. Dep't of Human Servs. , 2016 Ark. App. 435, 502 S.W.3d 569. A finding is clearly erroneous when, although there is evidence to support it, we are left with a definite and firm conviction that a mistake has been made. Id.
On appeal, Tovias argues that DHS only pled, and the court only found, one statutory ground for termination-aggravated circumstances. He further argues that the aggravated-circumstances ground applies only to one who is a "parent." More specifically, he argues that the juvenile code provides a very specific definition of parent and that his status as a "legal father" does not satisfy that definition.
His arguments involve statutory construction. We review issues of statutory interpretation de novo, as it is for this court to decide what a statute means. Baker Refrigeration Sys., Inc. v. Weiss , 360 Ark. 388, 201 S.W.3d 900 (2005) ; Monday v. Canal Ins. Co. , 348 Ark. 435, 73 S.W.3d 594 (2002). Our basic rule of statutory construction is to give effect to the intent of the legislature. Ward v. Doss , 361 Ark. 153, 205 S.W.3d 767 (2005) ; Ark. Tobacco Control Bd. v. Santa Fe Nat. Tobacco Co., Inc. , 360 Ark. 32, 199 S.W.3d 656 (2004). Where the language of a statute is plain and unambiguous, we determine legislative intent from the ordinary meaning of the language used. Id. In considering the meaning of a statute, we construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. Id. We construe the statute so that no word is left void, superfluous, or insignificant, and we give meaning and effect to every word in the statute, if possible. Id. When the language of a statute is plain and unambiguous, there is no need to resort to rules of statutory construction. Stephens v. Ark. Sch. for the Blind , 341 Ark. 939, 20 S.W.3d 397 (2000) ; Burcham v. City of Van Buren , 330 Ark. 451, 954 S.W.2d 266 (1997). We are not bound by the trial court's interpretation of a statute. However, in the absence of a showing that the trial court erred, its interpretation will be accepted as correct on appeal. Id.
III. "Legal Father" as "Parent"
The court terminated the parental rights of Tovias under the aggravated-circumstances ground codified at Arkansas Code Annotated section 9-27-341(b)(3)(B)(ix)(a) . This statute allows for the termination of parental rights when a "parent" is found by the trial court to have subjected the juvenile(s) to aggravated circumstances. Riggs v. Ark. Dep't of Human Servs. , 2019 Ark. App. 185. "Parent" is defined by Arkansas Code Annotated section 9-27-303(40) as a biological mother, an adoptive parent, or a man to whom the biological mother was married at the time of conception or birth, who has signed an acknowledgment of paternity pursuant to section 9-10-120, or who has been found by a court of competent jurisdiction to be the biological father of the juvenile.
We hold that the language of these statutes is plain and unambiguous and sets forth unequivocally the classes of persons for whom the aggravated-circumstances findings are applicable. As this case has been presented to us, Tovias simply does not fall within any of these designated categories.
Here, Tovias is not the mother, he is not an adoptive parent, and there is no evidence in the record that he was married to the mother at the time of JT's conception or birth; nor is there any evidence in our record that he has signed an acknowledgment of paternity pursuant to section 9-10-120 or that he has been found by the court to be the biological father of JT. What we do have is a finding by the court that Tovias is the "legal father" of JT. We cannot, however, ascertain on what basis *625 this determination was made, and we note that the terms "legal father" and "biological father" are not interchangeable. While a biological father can be a legal father, not all legal fathers are biological fathers. For example, a man can be a legal father based on his marriage at the time of conception or birth, by adoption, by acknowledgment, and yes, by biology-but at least for the purposes of the termination statutes, only if the court so finds.
Both our court and the supreme court have addressed the significance of the distinction between the terms "legal father" and "parent" in recent years. In Howerton v Arkansas Department of Human Services , 2016 Ark. App. 560, 506 S.W.3d 872, our court was faced with the situation in which there were, by definition, two legal fathers-a father by acknowledgment (Howerton) and a biological father (Edgar). The trial court recognized both fathers in the termination proceedings. We reversed, holding that a child cannot have more than one legal father; thus, once it was determined that Edgar was the biological father of the child, Howerton's status changed, and he was no longer deemed to be the "legal father." As a result, he had no legal rights to terminate.
Our case law indicates that it is necessary for a court to find that the father is the biological father. In Earls , supra , the supreme court held that Earls was not a parent for purposes of the termination statute even though DNA evidence was introduced indicating Earls was the biological father of the child. In that case, the trial court never recognized Earls as the biological father of the child, continued to treat him as a putative father, and never entered any order establishing his "legal status" as a "biological parent."
Similarly, our court has also reversed a termination because the trial court failed to make a finding that the father was the "biological father" of the child. In Northcross v. Arkansas Department of Human Services , 2018 Ark. App. 320, 550 S.W.3d 919, we held that even though there was DNA evidence to support a finding that Northcross was the child's father, the trial court had failed to elevate Northcross's status to that of a "parent" by making a finding that he was the biological father of the child. In other words, we concluded that the entry of the DNA test was insufficient by itself to make him a parent under the termination statutes. In so doing, we noted that this court cannot make a finding regarding paternity when the circuit court deliberately did not do so.
However, we have held that a party may, in some instances, acquiesce in a court's finding of "legal" parentage. In Brown v. Arkansas Department of Human Services , 2018 Ark. App. 104, 542 S.W.3d 899, Brown had been identified as the biological father of the child based on DNA results. The court added Brown as a party to the case and entered an order denoting him as the "legal father." Brown appealed, arguing that he had not specifically been found to be the biological parent and that his rights should not have been terminated. We affirmed the termination, holding that Brown had consented to and acquiesced in the trial court's finding that established his parental status. In doing so, however, we noted that the trial court had treated him as the "legal father" "after DNA testing had confirmed he [was] the biological father. " Brown , 2018 Ark. App. 104, at 11, 542 S.W.3d at 905 (emphasis added).
We have also held that a trial court's finding that a party is the biological parent without a corresponding pronouncement of the party's legal status as a parent is sufficient. In Johnson v. Arkansas Department of Human Services , 2018 Ark. App. 221, 547 S.W.3d 489, Johnson had a DNA test that indicated paternity, and an order of paternity was prepared but never entered.
*626 The court, however, in its fifteen-month-review hearing order, did state that a DNA test had shown Johnson to be the biological father. Under those facts, we found there was sufficient evidence to support a finding that Johnson was a "parent."
Unlike the preceding cases, here, we only have a finding of legal status and absolutely no basis in the record to support it. In that sense, the facts in this case are even more problematic than the facts presented in Earls and Northcross where we reversed despite DNA results indicating paternity. Nor is this case like Johnson , where there was a written acknowledgement by the court in a review order that Johnson was the biological father. Our facts are more consistent with those in Earls and Northcross than in Johnson .
We also decline to hold, as we did in Brown , that Tovias acquiesced in the court's finding of parentage. First, unlike in Brown , there is no underlying evidence to support the trial court's finding. Second, we note that the trial court's orders in this case frequently exchanged the terms "legal father" and "putative father" when referring to both Tovias and Flores-the other "father" identified in the case. As a result, we cannot tell on what basis the court made its finding of Tovias's status as "legal father" or how much significance to place on it; on this record, the court's designation of Tovias's status as a "legal father" is murky at best.
Because we reverse the termination decision on the statutory-grounds issue, we need not address Tovias's best-interest challenge.
Reversed and remanded.
Virden and Gladwin, JJ., agree.

Tovias has another child, JT, who was born on April 30, 2018, after the institution of these proceedings and is not a subject of this termination action. To eliminate any confusion, this child will be referred to as "JT (18)."

Tovias has no legal or biological relationship to the other four children, and their rights are not at issue here. Miranda is not a party to this appeal.

The petition named Juan Manuel Flores as the legal father of three of JT's siblings. Flores is not a party to this appeal.

The motion indicates it was received by the court on March 27 prior to adjudication but was not filed of record until March 29-the day after the adjudication hearing.

Oddly, Juan Manuel Flores, while designated in the style of the case as the legal father of three of JT's siblings, was described as a putative father in the body of the court's order.

Again, the case caption lists Flores as the legal father of three of the children, but the petition only identifies him as the putative father of the three.

The termination hearing was held on August 23, 2018, immediately following the adjudication, no-reunification-of-services, and permanency-planning hearings for JT (18). At some point after the permanency-planning hearing for JT, Tovias and Miranda wed. They were married at the time JT (18) was born, thereby making Tovias the presumed legal father of JT (18).