Cite as 2023 Ark. App. 138

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CV-22-602

|  |  |  |
|---|---|---|
| | | Opinion Delivered March 8, 2023 |
| ROBERT BEVELL | | APPEAL FROM THE CONWAY |
| | APPELLANT | COUNTY CIRCUIT COURT |
| | | [NO. 15JV-21-12] |
| V. | | |
| | | HONORABLE TERRY SULLIVAN, |
| | | JUDGE |
| ARKANSAS DEPARTMENT OF | | |
| HUMAN SERVICES AND MINOR | | |
| CHILD | | |
| | APPELLEES | AFFIRMED |

**WENDY SCHOLTENS WOOD, Judge**

Robert Bevell appeals the order of the Conway County Circuit Court terminating his parental rights to his daughter, Minor Child (MC), born on August 3, 2015. In his appeal, Bevell argues there is insufficient evidence supporting the statutory grounds for termination and the finding that termination is in MC's best interest. We affirm.

On March 25, 2021, the Arkansas Department of Human Services (DHS) removed MC and her siblings from the custody of her mother and stepfather, Martha and Matthew Warren, due to medical and environmental neglect. A petition for emergency custody was filed four days later. It identified Bevell as MC's putative father. The affidavit attached to the petition stated that DHS had opened a protective-services case involving the Warrens on February 24, 2021, for medical and environmental issues. The family lived in a small camper

that was cluttered with trash, raw sewage was present, and the children suffered from developmental delays and needed medical appointments, including intensive therapy. DHS had offered the family transportation to medical appointments and parenting services, but Matthew Warren declined them, stating he did not feel the children needed follow-up appointments and that, regarding parenting classes, DHS would need a court order for him to do anything.

The court granted the petition for emergency custody and, at a hearing on April 1, found probable cause to continue custody with DHS. The probable-cause order noted that Bevell was present at the hearing. The circuit court ordered him to submit to a paternity test and to complete a drug screen before leaving the courthouse. He did not submit to a paternity test that day and later acknowledged that he had marijuana and amphetamines in his system. The court announced at the hearing that the adjudication hearing would be held on May 27.

Bevell did not appear for the adjudication hearing. At that hearing, the circuit court found that MC and her siblings were dependent-neglected due to medical and environmental neglect by the Warrens.[1] The court set reunification as the goal of the case and again ordered Bevell to submit to a paternity test.

The court held two review hearings, one on September 16, and another on January 27, 2022, and continued the goal of reunification. Bevell was incarcerated at the time of

---

[1]The circuit court later terminated the Warrens' parental rights to all three children. The Warrens and MC's siblings are not parties to this appeal

2

these hearings. The order for the second review hearing noted that, due to his incarceration, Bevell had been unable to participate in the case in any meaningful way. The court ordered that he cooperate with efforts to resolve the issue of paternity and contact DHS upon his release from prison. After three missed appointments for DNA testing prior to his confinement, Bevell provided a DNA sample while incarcerated in December. DHS received the DNA results the day after the second review hearing, and the results showed that Bevell is MC's biological father.

The permanency-planning hearing was held on March 3, 2022. Bevell appeared by videoconference from prison. At the outset of the hearing, the court noted that the results of DNA paternity testing had been reported to DHS and that they showed that Bevell is MC's biological father.[2] The court asked Bevell's counsel if she had any objection to that determination, and she said she did not. The court then expressly found Bevell "is the biological father of [MC,]" and in its written order, it stated that Bevell is MC's "legal father."

Jillian Russell, a licensed mental-health therapist, testified at the permanency-planning hearing about MC's treatment. She said MC began therapy for PTSD in August 2021 and was progressing well. Russell testified that, until a month before the hearing, MC thought Bevell was dead and did not recall having any contact with him.

Bevell also testified at the permanency-planning hearing. He said that he had been incarcerated since August 2021. He explained that he was serving a five-year sentence for

---

[2]A report reflecting the DNA results was introduced as an exhibit at the hearing without objection.

probation violations in two separate cases: one involving lottery fraud and aggravated assault and another involving commercial burglary, theft of property, and felony fleeing. He testified that he had been present for the birth of MC and spent the first two years of MC's life with her and her mother. He said he and MC's mother then separated, and he lived with MC the next two years at his grandparents' home. However, Bevell said he had not seen MC for two years. He testified that he had not communicated with anyone from DHS since shortly after the probable-cause hearing and that he had not received any services from DHS.

Brandy Cochran, a DHS supervisor, testified that MC and her siblings had been adjudicated dependent-neglected for severe environmental and medical neglect and parental unfitness. She said the children had experienced developmental delays due to neglect and that MC had been underweight and "very, very delayed in her speech." Cochran said she had contact with Bevell in the first two to three weeks of the case, but thereafter, her contact with Bevell was limited because he was in and out of jail. She testified that he missed three appointments for his DNA test before it was finally conducted in December 2021 after he had been reincarcerated. She said she had received one letter from Bevell in the month before the permanency-planning hearing, and it asked about visitation with MC. She said Bevell was not receiving services from DHS and had been afforded no Zoom visits with MC. She recommended a goal change in the case to adoption with parental rights terminated.

Following the hearing, the court found Cochran to be credible, noted that Bevell had been incarcerated the majority of the case, by his own testimony had not seen MC in two years, and would not be eligible for release until June 2022. The court concluded that MC

needed permanency, and the goal was changed to adoption with termination of parental rights.

DHS subsequently filed a petition to terminate parental rights, alleging, as to Bevell, the following statutory grounds: (1) failure to remedy, Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)* (Supp. 2021); (2) subsequent factors, Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)*(a)*; and (3) aggravated circumstances, Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(B)*. The termination hearing was held on June 23, 2022.

Cochran's testimony at the termination hearing was similar to that at the permanency-planning hearing, including that DHS had failed to provide Bevell with services. She confirmed that Bevell did not reside at the home from which the children had been removed. Regarding MC, Cochran testified that she suffers from developmental delays, and her speech is almost "not understandable." Cochran said that when DHS initially contacted Bevell, it was discovered that he was on probation, facing revocation, and awaiting return to the penitentiary. He identified his grandparents as a possible placement option for MC, but they were not approved. Although there were safety concerns about the home and the grandparents' health problems, DHS's primary concerns were with Bevell and his father: Bevell had been living in the home, and his father, a sex offender, was living in a camper on the property. Bevell's father had offended against his children and was believed to have done so in the grandparents' home; therefore, there was concern that Bevell's grandparents would not be able to protect MC if she were living there. Cochran also testified that MC was at risk of harm because Bevell was incarcerated and could not take her. Cochran stated that MC is

adoptable, and although she has some delays developmentally and physically, she is making progress and is healthy.

Bevell testified that he was still incarcerated and said he would remain incarcerated until at least March 2023 when he would be considered for parole. Bevell said that before going to prison in August 2021, he had been incarcerated from the preceding November 2020 to January 2021 and then was in drug rehabilitation for a month. He conceded that he had been asked to submit to a DNA test at the April 2021 probable-cause hearing but did not do so. While he stated that he did not appear in the case after that because he lacked transportation, he also conceded that he made no effort to get custody of MC because he knew he was going back to prison and was not in a position to care for her. Without elaborating, he said when he is released, he will have housing and a job. However, he agreed it would not be fair to require MC to wait for his release, stating, "I believe a lot has been unfair to [her]."

At the close of the hearing, the circuit court terminated Bevell's parental rights to MC and subsequently entered its written order finding by clear and convincing evidence that termination of parental rights was in MC's best interest and that all three statutory grounds alleged support termination. Bevell appeals.

We review termination-of-parental-rights cases de novo. *Lloyd v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 461, at 7, 655 S.W.3d 534, 540. Termination requires a finding of at least one statutory ground and a finding that termination is in the child's best interest. *Id.* at 8, 655 S.W.3d at 540. Arkansas Code Annotated section 9-27-341(b)(3) requires a circuit

6

court's order terminating parental rights to be based on clear and convincing evidence. *Lloyd*, 2022 Ark. App. 461, at 8, 655 S.W.3d at 540. Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Baker v. Ark. Dep't of Hum. Servs.*, 340 Ark. 42, 48, 8 S.W.3d 499, 503 (2000). When the burden of proving a disputed fact is by clear and convincing evidence, the question that must be answered on appeal is whether the circuit court's finding was clearly erroneous. *Payne v. Ark. Dep't of Hum. Servs.*, 2013 Ark. 284, at 3. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* This court gives a high level of deference to the circuit court because it is in a far superior position to observe the parties before it and to judge the credibility of the witnesses and the weight of the evidence. *Id.*

On appeal, Bevell first challenges the circuit court's statutory grounds. He argues that there was no finding that he is MC's parent and that each of the statutory grounds found by the circuit court required DHS to prove that he is. Bevell argues that the case caption in every pleading and order in the case identified him only as MC's putative father or legal father and that the court's permanency-planning order finding him to be MC's "legal father" is insufficient to establish that he was found to be a parent.

Bevell acknowledges that the circuit court declared from the bench that he is MC's biological father at the permanency-planning hearing, but he argues it is the written order that controls, and because the written order stated only that he is MC's "legal father" and

7

did not state his biological relationship to MC or state that he is a parent, the requisite finding was never made. Bevell relies on *Earls v. Arkansas Department of Human Services*, 2017 Ark. 171, 518 S.W.3d 81, and *Northcross v. Arkansas Department of Human Services*, 2018 Ark. App. 320, 550 S.W.3d 919, to argue that the circuit court failed to make a finding that he is MC's biological father in any order. He also asks this court to reverse because the circuit court did not make an express finding that "the man is, in fact, a parent," in keeping with *Burks v. Arkansas Department of Human Services*, 2021 Ark. App. 309, 634 S.W.3d 527; *Terry v. Arkansas Department of Human Services*, 2019 Ark. App. 591, 591 S.W.3d 824; and *Campos v. Arkansas Department of Human Services*, 2022 Ark. App. 221, 644 S.W.3d 465.

The question in Bevell's case is whether the oral finding that Bevell is MC's biological father coupled with the written order finding Bevell to be MC's "legal father" qualifies as a finding that he is, in fact, MC's parent. In *Earls*, the circuit court discussed Earls's legal status on the record and mentioned DNA results reflecting a 99.9 percent probability of paternity, but the court never orally found that he was the biological father, and it did not enter an order making that finding either. 2017 Ark. 171, at 9–10, 518 S.W.3d at 87. Similarly in *Northcross*, DNA test results reflecting a 99.9 percent probability of paternity were entered into evidence, but the circuit court did not make a finding of paternity, oral or written. 2018 Ark. App. 320, at 10–13, 550 S.W.3d at 924–25.

In *Terry*, this court said that a lay person's reference to himself as a father, or even a DNA test showing a 99.9 percent probability that a man is the biological father of a child, is insufficient standing alone to establish parental status for purposes of the termination

8

process. There must be an express finding by the court to that effect. *Terry*, 2019 Ark. App. 591, at 8, 591 S.W.3d at 829. In *Burks*, 2021 Ark. App. 309, at 11, 634 S.W.3d at 533, we reversed and remanded a termination order, stating that the circuit court made Burks's legal status an issue but did not resolve the matter before terminating his parental rights. We held that the circuit court was required to make a specific finding that Burks is the parent before terminating his rights, but it never did so. *Id.*, 634 S.W.3d at 533. We did the same in *Campos*, holding that without a finding that Campos was a parent, the grounds applying to parents could not be applied to him. 2022 Ark. App. 221, at 12–13, 644 S.W.3d at 472.

Contrary to the facts in these cases, here, the circuit court specifically found Bevell to be MC's biological father. The parental element of the statutory grounds was satisfied by the circuit court's oral ruling at the permanency-planning hearing, which found Bevell to be MC's biological father on the basis of the report reciting the paternity-test results. While the circuit court's oral finding that Bevell is MC's biological father was not stated as such in a written order, in context, the court's use of the term "legal father," referring to Bevell in the permanency-planning order, was contingent on its oral finding. In *Nespor v. Arkansas Department of Human Services*, 2011 Ark. App. 745, at 8 n.3, 387 S.W.3d 239, 244 n.3, we said consideration of oral findings is appropriate in determining the intent of a court's written order.

In *Tovias v. Arkansas Department of Human Services*, 2019 Ark. App. 228, 575 S.W.3d 621, this court noted that a biological father can be a legal father, but not all legal fathers are biological fathers. *Id.* at 7, 575 S.W.3d at 624–25. This court stated that if a finding is made

by the court that one is a biological father, use of the term "legal father" in an order will be sufficient to demonstrate parentage under the statute. *Id.*, 575 S.W.3d at 625 (stating, for purposes of the termination statutes, "a man can be a legal father . . . by biology . . . if the court so finds"). The circuit court's findings on paternity, however, were "murky at best" in *Tovias. Id.* at 10, 575 S.W.3d at 626. We stated there that "we only [had] a finding of legal status and absolutely no basis in the record to support it." *Id.* at 9, 575 S.W.3d at 626.

Here, there was an oral finding at the permanency-planning hearing that Bevell is MC's biological father. Bevell's counsel said she had no objection to that finding. Use of the term "legal father" in the resulting written permanency-planning order, therefore, was sufficient to demonstrate the court's finding that Bevell is MC's parent under these circumstances. *Id.*, 575 S.W.3d at 626.

Bevell next argues that the circuit court clearly erred in finding that DHS proved statutory grounds necessary to terminate his parental rights. Only one ground is necessary to terminate parental rights. *Willis v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 559, at 9, 538 S.W.3d 842, 848. We hold that the circuit court did not clearly err in finding that Bevell subjected MC to aggravated circumstances.

The court's finding of aggravated circumstances was premised on the fact that there was little likelihood services would result in successful reunification. The evidence showed that Bevell was not incarcerated from April to August 2021, yet he did not seek reunification with MC because of his criminal issues. He admitted that he did not participate in the case during that period but said he did not do so because he was preparing to return to prison

and could not care for MC. Bevell did not comply with orders, beginning in April 2021, directing him to complete DNA testing until December 2021, after he was reincarcerated. He missed three testing appointments. Bevell was incarcerated at the termination hearing, had been incarcerated ten of the fifteen months of the case, and remained incarcerated under a five-year sentence. He testified that he would not be considered for parole until March 17, 2023, and he conceded that it would not be fair to MC to wait until March to see if he is paroled. On this evidence, we hold that the circuit court did not clearly err in determining that there is little likelihood that services to Bevell would result in successful reunification with MC.

Bevell contends that DHS failed to offer him meaningful services, and Cochran confirmed this. However, a finding of aggravated circumstances does not require that DHS prove that meaningful services toward reunification were provided. *Willis*, 2017 Ark. App. 559, at 9, 538 S.W.3d at 849. In *Willis*, Harris argued on appeal that the evidence of aggravated circumstance was insufficient because DHS failed to provide him with meaningful services. This court affirmed, reasoning that during the four months Harris had been out of jail, he had shown little interest in cooperating with DHS or visiting his child. This court stated that "a finding of aggravated circumstances does not require that DHS prove that meaningful services toward reunification were provided." *Id.* at 10, 538 S.W.3d at 849; *see also Kohlman v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 164, 544 S.W.3d 595 (holding that the father's criminal misconduct and incarceration for the majority of the case was an impediment to successful reunification and that it supported a finding of an

11

aggravated circumstance); *Cloninger v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 282, at 11 (same).

Bevell acknowledges that this statutory ground does not require proof that services were made available, but, citing *Duncan v. Arkansas Department of Human Services*, 2014 Ark. App. 489, at 9–10, he argues the lack of services can provide a basis for reversal. In *Duncan*, this court reversed a little-likelihood finding of aggravated circumstances because DHS had delayed providing Duncan services, Duncan was actively engaged in services, was making progress when her rights were terminated, and there was no indication that Duncan's inaction had contributed to the delay in starting services.

The circumstances in Bevell's case are not like those in *Duncan*. Bevell admittedly took no action in his case when he was not incarcerated, and he was incarcerated during most of the case and would remain incarcerated until the following year, with no guarantee of his release even then. We hold that the circuit court did not clearly err in finding the aggravated-circumstances ground.

In his final argument on appeal, Bevell challenges the circuit court's best-interest finding. To terminate parental rights, a circuit court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. *Migues v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 439, at 10, 586 S.W.3d 221, 227–28.

12

Bevell does not challenge the circuit court's adoptability finding. As for potential harm, Bevell argues that DHS failed to prove that he posed a potential harm to his daughter. We disagree. As previously noted, Bevell was incarcerated for the majority of the case. He was incarcerated at the time of termination and would remain incarcerated until the following year with no guarantee he would be released then. The evidence also shows that when Bevell was not incarcerated, he did not attend the adjudication hearing, he missed three DNA testing appointments, and he did not seek visitation with MC. He conceded that he knew he was going back to prison and knew he could not take care of MC. Finally, other evidence showed the lack of a bond between MC and Bevell. Bevell had not seen MC for two years, and she thought he was dead. *Fraser v. Ark. Dep't of Hum. Servs*, 2018 Ark. App. 395, at 10–11, 557 S.W.3d 886, 893–94 (affirming the circuit court's best-interest finding because the evidence demonstrated that the appellant had been incarcerated throughout the case and had no relationship with the child).

Bevell also argues that there was a less restrictive alternative to termination that would have served his family's interests. Bevell argues that his grandparents or another family member want MC. But Bevell admitted that the identity of the other family member was not provided to DHS, and Bevell's grandparents did not testify that they were willing to take custody of MC. Cochran testified that in her conversation with Bevell's grandfather, he did not say he wanted placement of MC. Further, Bevell's grandparents had been disapproved for placement due to concerns that MC would not be safe in their care, in part because Bevell lived there when he was not incarcerated and because Bevell's father lived on their property

13

and is a sex offender. While Bevell testified at the termination hearing that his father was in prison and had agreed not to live on the property upon his release, Cochran testified that she had been given no assurances of that.

In sum, no relatives of Bevell were approved for placement. To succeed on a relative-placement argument on appeal, at a minimum, there must be an appropriate and approved relative in the picture. *Thomas v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 457, at 7, 610 S.W.3d 688, 693 (noting where relatives have not been approved for placement and the children remained in foster care, the existence of potential relatives was not a basis to reverse a termination decision); *see also Minchew v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 95, at 9, ___ S.W.3d ___, ___ (notices consisting of only "names and addresses of five potential relatives" was insufficient to warrant reversal on least-restrictive-placement argument). Accordingly, we hold that the circuit court did not clearly err in finding that termination of Bevell's parental rights is in MC's best interest.

Affirmed.

THYER and BROWN, JJ., agree.

*Tabitha McNulty*, Arkansas Commission for Parent Counsel, for appellant.

*Ellen K. Howard*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Demarcus D. Tave*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.

14